REGAL FINANCE COMPANY, LTD.
and Regal Finance Company II,
Ltd., Petitioners,

v.

TEX STAR MOTORS,
INC., Respondent.

No. 08–0148.

Supreme Court of Texas.

Argued Sept. 9, 2009.

Decided Aug. 20, 2010.

Russell S. Post, David M. Gunn, David J. Beck, Michael Ernest Richardson II, Constance H. Pfeiffer, Erin Hilary Huber, Beck, Redden & Secrest, L.L.P., Houston, TX, for Regal Finance Company, Ltd. and Regal Finance Company II, Ltd.

Jacalyn D. Scott, Eugene B. Wilshire Jr., Wilshire & Scott, P.C., Houston, TX, for Tex Star Motors, Inc.

Justice MEDINA delivered the opinion of the Court in which Chief Justice JEFFERSON, Justice HECHT, Justice WAINWRIGHT, Justice GREEN, Justice WILLETT, Justice GUZMAN, and Justice LEHRMANN joined.

Under Article 9 of the Uniform Commercial Code, a secured creditor may repossess collateral after a default, dispose

of it, and then sue for any deficiency that remains after the proceeds from the collateral are applied to the debt. A secured creditor that seeks to recover a deficiency, however, must prove that it acted in a "commercially reasonable" manner in disposing of collateral. In this case, the secured creditor proved that to the satisfaction of the jury, who awarded it a deficiency judgment. The court of appeals, however, set the verdict aside, finding no evidence of commercial reasonableness. 246 S.W.3d 745, 751–52 & n. 9.

The court concluded that the jury instructions on commercial reasonableness here required proof of a particular industry standard, regardless of whether Article 9 required such proof. *Id.* Because the secured creditor failed to produce any evidence of this standard, the court further concluded there was no evidence of commercial reasonableness and therefore no basis for a deficiency judgment against the debtor. *Id.* We, however, disagree that the jury charge altered the standard for commercial reasonableness under Article 9. We further conclude that evidence of commercial reasonableness here is legally sufficient to support the jury's verdict. Accordingly, we reverse the court of appeals' judgment and remand the case to that court for its further consideration.

## I

In 1996, Tex Star Motors, a used-car dealer, signed a Retail Installment Contract Purchase and Sales Agreement ("PSA") with Regal Finance Company, Ltd. and, in 1999, another PSA (collectively, the "PSAs") with Regal Finance Company II, Ltd. (collectively, "Regal"). The PSAs obligated Tex Star to offer each secured automobile installment note it generated through consumer sales to Regal,

which could then purchase the note at its discretion. Under these agreements, Tex Star sold the notes to Regal with "full recourse," meaning Regal could require Tex Star to repurchase any non-performing loans. The PSAs also created a dealer-reserve fund, titled the "Holdback Reserve[,]" capitalized by Regal withholding $750 from the amount it paid Tex Star when purchasing each note. While maintained by Regal, the Holdback Reserve belonged to Tex Star. Its primary purpose was to finance Tex Star's note-repurchase obligations if any loans became nonperforming. In practice, Regal paid Tex Star $2,000 from the Holdback Reserve when Tex Star repurchased a non-performing note. After payment of all notes purchased from Tex Star, Regal was to return any remaining amount in the dealer reserve to Tex Star.

As its business with Tex Star expanded, Regal outgrew its existing lending relationships with smaller banks. In 1999, Regal obtained a three-year, $25,000,000 revolving line of credit with Bank One. The Bank One loan agreement required Regal to maintain a dealer-reserve fund that equaled 5% of the principal balances of Regal's outstanding notes.

Regal and Tex Star never agreed in writing who would be responsible for keeping the dealer-reserve fund compliant with the Bank One loan agreement. Regal's manager testified that Tex Star orally agreed to maintain the dealer-reserve fund because it meant more financing for Tex Star without any additional personal liability for Tex Star's owners. Tex Star denied the existence of any oral agreement. Nevertheless over the next two and a half years, Tex Star deposited a total sum of $975,000 to maintain the dealer reserve at the level dictated by the Bank One loan

agreement.[1]

By 2002, Bank One had decided to exit sub-prime auto lending and notified Regal that it would not renew its credit line. Regal, in turn, informed Tex Star that it would not be buying Tex Star's automobile notes for at least a year while it procured alternate financing. Around the same time, Regal sought $386,000 from Tex Star to bring the dealer-reserve fund into compliance with the Bank One loan agreement.

Tex Star's attorney advised that neither the PSAs nor the Bank One loan agreement obligated Tex Star to maintain the reserve levels mandated by the Bank One loan agreement. Heeding this advice, Tex Star refused to fund the $386,000. Tex Star did, however, continue to repurchase nonperforming notes from Regal over the next few months, but Regal quit paying Tex Star $2,000 per note from the Holdback Reserve.

In November 2002, Tex Star notified Regal it was suspending performance under the PSAs and would no longer collect notes, or repossess and sell vehicles, on Regal's behalf. Rather than hire another company to provide these services, Regal decided to handle these matters itself.

In early December 2002, Regal established a location to service its notes' portfolio and handle repossessions. Within three days of opening this location, Regal accepted 100 repossessed vehicles from Tex Star, followed by 2,400 loan files over the next two weeks. Having little expertise in the used-car business, Regal hired James Wright, an automobile sales professional who had bought and sold several thousand used vehicles over a 29–year period. Regal required Wright to evaluate and liquidate the repossessed vehicles.

## II

After selling 906 repossessed vehicles for less than the outstanding loan balances, Regal sued Tex Star for the deficiency. Tex Star filed a counterclaim, seeking the funds held in the dealer-reserve fund, monies allegedly owed under the PSAs for notes it repurchased, and statutory damages for Regal's alleged failure to provide notice and to conduct the vehicle sales in good faith and in a commercially reasonable manner.

The case was tried to a jury, which found that Tex Star failed to comply with the PSAs and was liable for some, but not all, of the deficiencies Regal sought. In answering the damages question, the jury was instructed to consider only the loans relating to vehicles that Regal sold in good faith and in a commercially reasonable manner. Jury instructions also provided additional information on the meaning of these terms.

Finding Regal sold some vehicles in good faith and in a commercially reasonable manner, the jury awarded Regal $4,000,000 in deficiency damages. The jury also found that Tex Star had agreed to maintain the dealer-reserve fund at the level required by the Bank One loan agreement and that $975,000 in that fund belonged to Tex Star. The trial court rendered judgment on the verdict, in part, awarding Regal $4,136,000 in damages plus attorney's fees and interest. The court further denied all Tex Star's claims, including its claim to monies held in the dealer-reserve fund. Regarding the $975,000 from that fund awarded to Tex Star by the jury, the trial court rendered judgment notwithstanding the verdict.

1. This was in addition to the PSA-mandated $750 Regal withheld when purchasing the notes from Tex Star.

The court of appeals reversed the trial court's judgment, vacating the deficiency judgment in Regal's favor and awarding Tex Star the $975,000 held by Regal in the dealer-reserve fund. 246 S.W.3d at 755–56. In setting aside Regal's favorable verdict, the court concluded there was no evidence of commercial reasonableness in the vehicles' dispositions, at least when measured against the jury instructions. *Id.* at 752.

## III

Article 9 of the Uniform Commercial Code requires that a secured creditor act in good faith and in a commercially reasonable manner, and, in most cases, provide reasonable notification when disposing of repossessed collateral. *See* TEX. BUS. & COM.CODE § 9.625 cmt. 2. A secured creditor must prove it disposed of the collateral in a commercially reasonable manner before it may recover any deficiency. *See id.* § 9.610; *see also Greathouse v. Charter Nat'l Bank–Sw.*, 851 S.W.2d 173, 176 (Tex. 1992). Every aspect of a collateral disposition must be commercially reasonable, "including the method, manner, time, place, and other terms." TEX. BUS. & COM. CODE § 9.610(b). Article 9 provides several examples of commercially reasonable dispositions, commonly referred to as safe harbors. These safe harbors include:

(1) dispositions "made in the usual manner on any recognized market;"

(2) dispositions made "at the price current in any recognized market at the time of the disposition[s];"

(3) dispositions made "in conformity with reasonable commercial practice among dealers in the type of property that was the subject of the disposition[s]."

*Id.* § 9.627(b)(1)-(3). However, a comment to Article 9 explains that these safe harbors are not the exclusive means of proving commercial reasonableness. *Id.* § 9.627 cmt. 3; *Havins v. First Nat'l Bank of Paducah*, 919 S.W.2d 177, 181 (Tex.App.-Amarillo 1996, no writ) (citing a substantively similar section 9.507 before it was recodified as section 9.627).

### A

▪ The trial court instructed the jury on the meaning of good faith and commercial reasonableness in the following instructions contained in Question 6 of the jury charge:

> In answering this question, consider only Loans relating to vehicles that [Regal] sold in good faith and in a commercially reasonable manner. Good faith means honesty in fact and the observance of reasonable commercial standards of fair dealing.
>
> Every aspect of the disposition, including method, manner, time, place and other terms must be commercially reasonable. A sale is commercially reasonable *if* it conforms to reasonable commercial practices among dealers in the type of property that was the subject of the sale.
>
> The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by [Regal] is not of itself sufficient to preclude [Regal] from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner.

(emphasis added). The instruction's second paragraph appears to track the language of Article 9, specifically sections 9.610(b) and 9.627(b)(3).[2]

---

**2.** Section 9.610(b) reads, "Every aspect of a

disposition of collateral, including the meth-

The court of appeals concluded that the above instruction required Regal to prove its sales conformed to a reasonable dealer standard, or in the words of the instruction, "conform[ed] to reasonable commercial practices among dealers in the type of property that was the subject of the sale." By reading the "if" in the instruction's second paragraph to mean "only if," the court converted one of Article 9's safe harbor provisions into a mandatory condition of proof. *See id.* § 9.627(b)(3). And, because there was no evidence that Regal's sales conformed to this reasonable dealer standard, the court reversed and rendered. 246 S.W.3d at 751–52.

Regal complains that the court's understanding of the instruction on commercial reasonableness is mistaken. More specifically, Regal submits the court has failed to interpret the word "if" in the context of the instruction. Regal further complains that this misinterpretation led the court to alter Regal's burden of proof, contrary both to the requirements of Article 9 and the plain meaning of the instruction itself. We agree.

The word "if" can hold different meanings in different contexts. It ordinarily describes a non-mandatory condition.[3]

The clearest expression of a mandatory condition is to say "only if".[4] In some contexts, where only one option exists to satisfy the condition, "if" can present a mandatory condition without being preceded by the word "only".[5] It is more common, however, for the word to introduce a non-exclusive condition, like the following example:

> The Texas Supreme Court has jurisdiction over an interlocutory appeal "if" there is a dissent in the court of appeals.

This sentence read in isolation would only grant jurisdiction if there were a dissent in the court of appeals. However, in the context of the Texas Government Code, the Court has jurisdiction if a court of appeals justice dissented, but the Court would also have jurisdiction if other statutory conditions exist, even without a dissent. Based on this context, the sentence cannot accurately be read in isolation without sacrificing the balance of the statute's meaning.

In the context of the this jury charge, "if" cannot mean "only if" without sacrificing the meaning of other parts of the instruction. The instruction's second paragraph begins with a general description of commercial reasonableness.[6] The next

---

od, manner, time, place, and other terms, must be commercially reasonable." TEX. BUS. & COM.CODE § 9.610(b). Section 9.627(b)(3), one of the safe harbor provisions, states, "A disposition of collateral is made in a commercially reasonable manner if the disposition is made ... in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." *Id.* § 9.627(b)(3).

**3.** *See, e.g.,* COMPACT EDITION OF THE OXFORD ENGLISH DICTIONARY 1370–71 (1971); WEBSTER'S II NEW COLLEGE DICTIONARY 549 (1995).

**4.** *See* BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 414 (2d ed.1995) (stating the phrases "if, and only if" and "if, but only if" are unnecessary way of saying "only if," but

not stating those phrases are another way of saying "if"). The Webster's II New College Dictionary defines "if" different ways, but when it gives an example for the mandatory "on condition that" definition it uses "if" preceded by the word "only[.]" WEBSTER'S II NEW COLLEGE DICTIONARY 549 (1995).

**5.** The court of appeals quotes a litany of one sentence pattern jury charges to illustrate this point. 246 S.W.3d at 751 n. 4. In this limited, single sentence context, "if" creates a mandatory condition. The jury instruction in this case exists in no such vacuum and needs to be read in context.

**6.** "Every aspect of the disposition, including method, manner, time, place and other terms must be commercially reasonable."

sentence supplies a specific method for proving commercial reasonableness.[7] The following paragraph implies that other disposition methods outside those practices among dealers may still be commercially reasonable.[8] If the second sentence provided the exclusive method of proving commercial reasonableness, the preceding sentence and the following paragraph would be superfluous.

■ We have said that a jury charge submitting liability under a statute should track the statutory language as closely as possible. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex.1994)(citing *Brown v. Am. Transfer & Storage Co.*, 601 S.W.2d 931, 937 (Tex.1980)). The language may be slightly altered to conform the issue to the evidence presented in the case, *Brown*, 601 S.W.2d at 937, but a court should not burden a jury with surplus instructions, *Acord v. Gen. Motors Corp.*, 669 S.W.2d 111, 116 (Tex.1984).

The instruction here closely tracked the language of sections 9.610(b) and 9.627(b)(3). This is not to say that the instruction perfectly conveyed Article 9's requirements. Qualifying the second sentence as a non-exclusive method of proving commercial reasonableness would have clarified its purpose. But read in context, the first sentence conveys the general rule, the second sentence offers an alternative method to prove commercial reasonableness, and the following paragraph allows that other commercially reasonable methods may be used.

The dissent characterizes our analysis as a departure from the well-established rule

that evidential sufficiency be measured against the jury charge. To the contrary, we agree that the evidence must be measured against the charge. We simply disagree about what the charge requires. The dissent reads the second sentence's mention of reasonable commercial practices among dealers as an exclusive definition, providing the only method by which the jury could measure commercial reasonableness. In the context of the instruction, however, we read it as merely an example of one method for determining commercial reasonableness. Although the second sentence, in isolation, lacks qualifying language, the preceding sentence and concluding paragraph inform that the dealer standard is not the exclusive means of establishing commercial reasonableness.

We conclude then that the court of appeals erred in reading the jury instruction on commercial reasonableness to require evidence of a reasonable dealer standard. At a minimum, however, the instruction required some evidence of the method, manner, time, place, and other terms of sale from which the jury might find commercial reasonableness.

B

■ Although commercial reasonableness is not precisely defined in Article 9, courts have considered a number of non-exclusive factors when addressing the term, such as: (1) whether the secured party endeavored to obtain the best price possible; (2) whether the collateral was sold in bulk or piecemeal; (3) whether it was sold via private or public sale; (4) whether it was available for inspection be-

---

7. "A sale is commercially reasonable if it conforms to reasonable commercial practices among dealers in the type of property that was the subject of the sale."

8. "The fact that a greater amount could have been obtained by a collection, enforcement,

disposition, or acceptance at a different time or in a different method from that selected by [Regal] is not of itself sufficient to preclude [Regal] from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner."

fore the sale; (5) whether it was sold at a propitious time; (6) whether the expenses incurred during the sale were reasonable and necessary; (7) whether the sale was advertised; (8) whether multiple bids were received; (9) what state the collateral was in; and (10) where the sale was conducted. *See, e.g., Havins,* 919 S.W.2d at 181 (citing *Pruske v. Nat'l Bank of Commerce of San Antonio,* 533 S.W.2d 931, 937 n. 1 (Tex.Civ. App.-San Antonio 1976, no writ)). As these factors imply, commercial reasonableness is a fact-based inquiry that requires a balance of Article 9's two competing policies: (1) protecting debtors against creditor dishonesty and (2) minimizing interference in honest dispositions. *Pruske,* 533 S.W.2d at 937 (citing William E. Hogan, *The Secured Party in Default Proceedings Under the UCC,* 47 Minn. L.Rev. 205, 219–20 (1962)). The inquiry's ultimate purpose, however, is to ensure the creditor realizes a satisfactory price. 4 James J. White & Robert S. Summers, Uniform Commercial Code § 34–11(b) (6th ed.2010). But, a satisfactory price is not necessarily the highest price, and it is recognized that secured creditors frequently sell in the low end of wholesale markets. *Id.* § 34–11(c).

At trial, several witnesses testified about Regal's dispositions of the repossessed vehicles. However, James Wright, the individual hired by Regal to evaluate and dispose of the vehicles, provided most testimony regarding the method and manner of disposition. Wright testified he would inspect each car, fill out a condition report, and use this information to produce a separate report that included the vehicle's features and an estimated value. He would compare this report to the vehi-

cles, ensuring the vehicles had the same features, then attempt to solicit at least two bids from wholesalers.[9] Wright testified that most sales were made privately to a small number of trusted automobile wholesalers.[10] He justified this practice by describing that the generally poor condition and high mileage of the vehicles limited the price that could be obtained by selling to non-wholesalers. Wright also testified that Regal, as a finance company, did not have the facilities, nor the license to sell the vehicles retail. Wright further testified Regal auctioned a small number of vehicles to test that method's effectiveness, but discontinued utilizing auctions when it determined the practice to be expensive and ineffective, garnering lower prices than private sales. Wright also testified that the pure volume of repossessed vehicles and the need to timely dispose of the collateral meant that some procedures, notably receiving at least two bids on each vehicle, were not always followed. However, Wright emphasized his substantial experience selling automobiles when attesting that Regal strove to achieve the highest selling price, under the circumstances, on all 906 dispositions.

Additionally, Regal entered the 906 loan files as evidence of the time, place, and other terms of each disposition. Not all loan files were complete, but a complete file would contain the loan note, a certificate of title (copy), a loan payment record, a repossession affidavit, a vehicle condition report, a NADA form estimating value, and any bids tendered for the vehicles. Copies of various negotiable instruments containing the date, time, price, and identifying the collateral's buyer were also entered into evidence.

---

**9.** Another experienced buyer and seller of used vehicles opined that this sealed bid method was an appropriate way to sell repossessed vehicles.

**10.** Notably, Tex Star was one of the buyers, bidding on 109 vehicles, but submitting the highest bid only twenty times.

In rebuttal, Tex Star emphasized other evidence suggesting that Regal could have obtained a superior price for the vehicles it sold and that Regal did not sell all the vehicles in a commercially reasonable manner. Specifically, Tex Star introduced evidence that some wholesaler buyers resold Regal's repossessed vehicles at a profit through subsequent auctions. Tex Star also presented a wholesaler, John Thorpe, Jr., as a witness. Thorpe testified he unsuccessfully bid on some of Regal's vehicles, then subsequently paid the winning wholesalers the same amount as his original bids. Further, Tex Star disputed Regal's account of its unsuccessful auctions by comparing information in the loan files to the auction results. On cross examination, Wright admitted not receiving at least two bids on every vehicle and that the 906 loan files were not always complete. Additionally, testimony showed the vehicles were not publicly advertised for sale and other evidence revealed a large average deficiency per sale.

 Legally sufficient evidence is that which "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). When reviewing whether evidence is legally sufficient to support a verdict, we "must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id.* at 807. Evidence is legally insufficient "when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Merrell Dow Pharms., Inc. v.*

*Havner,* 953 S.W.2d 706, 711 (Tex.1997). Evidence that is " 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists" is less than a scintilla. *Kroger Tex., Ltd. P'ship v. Suberu,* 216 S.W.3d 788, 793 (Tex.2006) (quoting *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004)). For evidence to conclusively establish the opposite of a vital fact, the evidence must be the type that could not lead reasonable people to different conclusions. *City of Keller,* 168 S.W.3d at 815–16.

Regal's testimony on the method and manner of its sales coupled with the loan files evidencing time, place, and other terms creates more than a suspicion or surmise that at least a portion of Regal's sales were commercially reasonable. Tex Star challenges and contradicts much of Regal's evidence, but its substance is not such as to prevent reasonable people from drawing different conclusions. Because the conflicting evidence created a fact issue upon which reasonable minds could differ, we must reject Tex Star's legal sufficiency challenge.

In the court of appeals, Tex Star also challenged the factual sufficiency of the evidence. The court of appeals, however, did not reach the issue, having determined there to be no evidence of commercial reasonableness under its erroneous view of the charge. Because a review of the evidence for factual sufficiency is a power committed exclusively to the court of appeals, we must remand the issue to that court. *See* TEX. CONST. art. V, § 6(a); *see also BIC Pen Corp. v. Carter,* 251 S.W.3d 500, 509 (Tex.2008). We merely hold that there is some evidence of commercial reasonableness in this record and that the jury instruction did not negate its existence. The other issues in the case are remanded to the court of appeals.

\*　　\*　　\*　　\*　　\*　　\*

The judgment of the court of appeals is reversed and the cause is remanded to that court for its further consideration.

Justice JOHNSON filed a dissenting opinion.

Justice JOHNSON, dissenting.

The Court concludes there is some evidence to support the jury's findings of damages based on Regal's disposal of repossessed vehicles in a commercially reasonable manner, even though there is no evidence the dispositions conformed to standards in the one jury instruction setting out how sales could be commercially reasonable. The Court's holding effectively approves the jury's having decided on its own what the standards are for commercially reasonable dispositions of repossessed automobiles. It then remands the case for the court of appeals to measure the factual sufficiency of the evidence against that unknown standard.

The Court's analysis is flawed in two major ways. First, the Court does not adhere to the rule that sufficiency of the evidence must be measured against definitions as they are given in the jury charge, even if the definitions are incomplete or incorrect. Second, lay jurors are not presumed to know the meaning of legal terms such as "commercially reasonable." So even assuming it would have been proper for the jury to determine whether Regal's sales of vehicles were commercially reasonable using a standard other than the definition given in the charge, the only way the jury would have known another standard would have been through evidence such as properly qualified expert testimony regarding the other standard. There was no such evidence. Accordingly, I disagree with the Court's conclusion that there is legally sufficient evidence Regal's sales were commercially reasonable and thus disagree with its holding that there is

legally sufficient evidence of Regal's damages to the extent those damages were based on commercially reasonable sales.

## I. The Jury Charge Defined "Commercially Reasonable"

The jury charge contained standard instructions, including the instruction that "[w]hen words are used in this charge in a sense that varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other meaning." *See* Tex.R. Civ. P. 226a. A trial court must submit "such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex.R. Civ. P. 277. Jury charges are directed to lay jurors untrained in the law, thus charge language is evaluated from the perspective of such a juror. *See Columbia Rio Grande Healthcare, L.P. v. Hawley,* 284 S.W.3d 851, 862 (Tex.2009); *Galveston, H. & S. A. Ry. Co. v. Washington,* 94 Tex. 510, 63 S.W. 534, 538 (1901).

Neither of the parties nor the Court maintains that laypersons have a common understanding of the legal term "commercially reasonable" as it is used in the Uniform Commercial Code (UCC). Thus, the term is one that should have been defined in the charge. *See Tex. & P. Ry. Co. v. Mercer,* 127 Tex. 220, 90 S.W.2d 557, 560 (1936) (explaining that "proximate cause" is a legal phrase requiring definition); *Magnolia Petroleum Co. v. Long,* 126 Tex. 195, 86 S.W.2d 450, 455 (1935); *Reliable Consultants, Inc. v. Jaquez,* 25 S.W.3d 336, 344 (Tex.App.-Austin 2000, pet. denied); *Mayes v. Stewart,* 11 S.W.3d 440, 455 (Tex. App.–Houston [1st Dist.] 2000, pet. denied) ("While the trial court must explain legal or technical terms, its discretion in determining the sufficiency of such explanations is broad."); *Johnson v. Whitehurst,* 652

S.W.2d 441, 447 (Tex.App.-Houston [1st Dist.] 1983, writ ref'd n.r.e.) ("The only requirement to be observed is that the trial court must give definitions of legal and other technical terms.").

The issue arises from Question 6 of the charge which submitted Regal's alleged damages. The question began by asking what sum of money, if any, would fairly and reasonably compensate Regal for its damages. The question had four parts with separate elements of damages submitted in each part. Parts (a) and (b) and their accompanying instructions are the parts relevant to the Court's decision. In those parts, the jury was instructed to find Regal's damages measured by

a. The difference, if any, between the unpaid balance on all Loans that Tex Star has not guaranteed and the amount received by [Regal] upon the sale of the vehicles that served as collateral for such Loans.

In answering this question, consider only Loans relating to vehicles that [Regal] sold *in good faith and in a commercially reasonable manner. Good faith* means honesty in fact and the observance of reasonable commercial standards of fair dealing.

Every aspect of the disposition, including the method, manner, time, place and other terms must be commercially reasonable. *A sale is commercially reasonable* if it conforms to reasonable commercial practices among dealers in the type of property that was the subject of the sale.

The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by [Regal] is not of itself sufficient to preclude [Regal] from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner.

. . . .

b. The difference, if any, between the unpaid balance on all Loans that Tex Star has not guaranteed and the amount received by [Regal] upon the sale of the vehicles that served as collateral for such Loans. For purposes of this question, consider only Loans relating to vehicles that [Regal] sold *in good faith and in a commercially reasonable manner as those terms are defined in the preceding paragraphs,* and after giving reasonable notice to Tex Star.

(emphasis added).

In regard to the second paragraph of instructions to (a) the Court says "read in context, the first sentence ["Every aspect of the disposition, including the method, manner, time, place and other terms must be commercially reasonable"] conveys the general rule, the second sentence ["A sale is commercially reasonable if it conforms to reasonable commercial practices among dealers in the type of property that was the subject of the sale"] offers an alternative method to prove commercial reasonableness, and the following paragraph ["The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method"] allows that other commercially reasonable methods may be used." 355 S.W.3d 595. But under this record, the second sentence does not merely set out an *alternative* method by which the jury could determine whether the sales were commercially reasonable, as the Court says it does; it gives the only method in the charge for evaluating whether Regal's sales were commercially reasonable and therefore defined the term. Thus, for purposes of this case, the second sentence told the jury what the term "commercially reasonable" means,

and it can hardly be disputed that lay persons understand that what a word or term means is a definition of the term. *See also* BLACK'S LAW DICTIONARY 455 (8th ed.2004) ("define" means to state or explain explicitly, to fix or establish, to set forth the meaning of a word or phrase; "definition" means the meaning of a word as explicitly stated in a drafted document); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 327 (11th ed.2003) ("definition" is a statement expressing the essential nature of something or a statement of the meaning of a word or word group or a sign or symbol). As a definition of the term, the second sentence set forth the only standard in the charge by which the jury could evaluate whether Regal's sales were commercially reasonable and still follow the charge, regardless of whether the definition was a complete statement of the law. Therefore, the sufficiency of the evidence of a commercially reasonable sale must be measured against the definition in the charge. *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex.2005) ("The sufficiency of the evidence must be measured by the jury charge when, as here, there has been no objection to it."); *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000) ("Since neither party objected to this instruction, we are bound to review the evidence in light of this definition."); *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex.2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge.").

The text of Question 6 supports the conclusion that it defines the term "commercially reasonable" as used in the charge. Although the term could have been defined

in different ways pursuant to the UCC and cases cited by the Court, it was not;[1] it was defined in one way. The trial court did not include words qualifying the definition as one of several alternative ways Regal could have proven its sales were commercially reasonable. *See* TEX. BUS. & COMM.CODE § 9.627(b)(3). Further, the structure of the sentence militates in favor of using the definition as a complete definition, and against the jury's considering the definition as one of several alternatives. The foregoing is also consistent with the specific language in (b) that refers to definitions of "good faith" and "commercially reasonable" in (a). The instruction in (b) inquired about damages Regal incurred due to unpaid balances on "Loans relating to vehicles that [Regal] sold in good faith and in a commercially reasonable manner, *as those terms are defined* in the preceding paragraphs." (emphasis added).

And, contrary to the Court's statement, the third paragraph of (a) does not imply to the jury that there are other methods of determining whether dispositions of collateral are commercially reasonable or offer any guidance for what would comprise a commercially reasonable sale. It neither adds to nor detracts from the definition of "commercially reasonable" in the preceding paragraph. Rather, the third paragraph merely emphasizes that the process of a disposition is what must be commercially reasonable, and that the end result— the price received for the collateral— should not by itself dictate a finding that a disposition did not conform to commercially reasonable methods.

Further supporting the conclusion that the sentence "A sale is commercially rea-

---

1. For example, Tex Star submitted a proposed instruction setting out numerous factors the jury could consider in determining if Regal's disposition methods were commercially reasonable. The proposed instruction included language allowing reasonable commercial practices among dealers in the type of property that was the subject of the sale to be considered as a factor. The trial court refused the instruction.

sonable if it conforms to reasonable commercial practices among dealers in the type of property that was the subject of the sale" defines "commercially reasonable" as opposed to merely offering the jury an alternative method to make its findings is the fact that the structure of the sentence is consistent with that of other definitions throughout the charge. The charge contained a separate "Definitions" section and also included definitions in connection with individual jury questions, although they were not always labeled as definitions. Several examples illustrate the point. In the "Definitions" section, "apparent authority" was among the words and phrases defined. The definition did not contain language such as "When the term 'apparent authority' is used, it means ..." or " 'Apparent authority' is defined as ..." but it nevertheless clearly was a definition both because of its being in the "Definitions" section and because it substantively would be understood by a lay jury as defining the term:

> Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists.

*See* BLACK'S LAW DICTIONARY 455 (8th ed.2004); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 327 (11th ed.2003).

Next, Question 1 inquired whether Regal and Tex Star agreed Tex Star would maintain a dealer reserve account, and the jury was instructed that it could consider "any earlier course of dealing" between Regal and Tex Star. The immediately following instruction set out the essential legal nature of the term "course of dealing" and could only be construed as a definition even though it was not identified as such:

> A course of dealing is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

And in Question 3 the jury was asked: "Did Regal partly perform?" An accompanying instruction did not specify that it was defining "partial performance" but it manifestly did so because it set out the meaning of the term:

> Partial performance occurs when—
> a. a party takes actions that can only be explained as reliance on an oral promise;
> b. the party acting in reliance on the contract has suffered a substantial detriment for which it has no adequate remedy; and
> c. failure to enforce the oral promise would award an unearned benefit to the other party.

In Question 9 inquiring whether Tex Star and its principals committed fraud, "fraud" was defined by an instruction that was not specifically identified as a definition:

> Fraud occurs when—
> a. a party makes a material misrepresentation,
> b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,
> c. the misrepresentation is made with the intention that it should be acted on by the other party, and

d. the other party justifiably relies on the misrepresentation and thereby suffers injury.

The foregoing demonstrate that within the charge there were three structural concepts relevant to the issues on this appeal. First, whether a jury instruction was a definition depended on the instruction's context and substance rather than on whether the instruction was labeled as a definition. Second, definitions in the charge typically did not include language limiting the meaning of the word or term defined to the enumerated elements and no other elements. Third, the trial court's general instruction that the jury was bound to accept and apply the definitions given in the charge required the jury to make its findings according to the substance and essential elements set out by the definitions in the charge even though the large majority of instructions that defined terms did not limit the definitions to the words used in defining the terms by including language such as "only if" or "if but only if."

Citing Texas Business and Commerce Code section 9.627(b)(1)-(3) and comment 3, the Court says "Article Nine provides several examples of commercially reasonable dispositions, commonly referred to as safe harbors," then lists three examples from the statute. 355 S.W.3d 595. The Court further notes that "a comment to Article Nine explains that these safe harbors are not the exclusive means of proving commercial reasonableness." 355 S.W.3d 595. The Court also lists ten factors, noting "[a]lthough commercial reasonableness is not precisely defined in Article Nine, courts have considered a number of non-exclusive factors when addressing the term." 355 S.W.3d 595. The Court recites evidence of several different methods that Regal used to sell the vehicles, such as soliciting bids from wholesalers, private sales to a small number of trusted wholesalers, and auction, and concludes that Regal's evidence on the method and manner of its sales, together with the loan files and their contents, creates more than a suspicion or surmise that at least a portion of Regal's sales were commercially reasonable. The problem is, the jury did not have (1) the benefit of the Court's knowledge of the UCC; (2) access to the appellate opinions the Court cites; or (3) knowledge of the various factors the Court says could be considered when the jury was determining whether Regal's sales were commercially reasonable, because the information was not included in the charge and there was no evidence such as expert testimony that those factors should be considered and if so, how. Even if some of the jurors had the benefit of the Court's knowledge of the UCC and the appellate opinions the Court cites, unless the charge instructed the jury that such law or particular aspects of it was applicable or the law was injected into the trial through evidence, the jury could not use it in making its decisions. That is because the jury was bound and limited by the charge language and, in matters beyond the common knowledge and understanding of lay jurors, by the charge and evidence admitted at trial, such as testimony from experts. *See, e.g., Mack Trucks v. Tamez,* 206 S.W.3d 572, 583 (Tex.2006); *FFE Transp. Servs. v. Fulgham,* 154 S.W.3d 84, 89 (Tex.2004).

The three paragraphs of instructions and definitions in (a), when read as a lay jury would read them, seamlessly and in a logical manner told the jury what evidence was required for Regal to have proven its damages. Paragraph two of (a) begins by instructing the jury to consider only loans relating to vehicles Regal sold (1) in good faith and (2) in a commercially reasonable manner. That paragraph, by the next sen-

tence, defines "good faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing." The next paragraph then defines "commercially reasonable manner" by telling the jury that in order for a disposition to be in a commercially reasonable manner, every aspect of the disposition must be commercially reasonable. The following sentence defines "commercially reasonable": "A sale is commercially reasonable if it conforms to reasonable commercial practices among dealers in the same type of property that was the subject of the sale." But nowhere did the charge tell the jury what factors or elements would be considered reasonable among dealers in repossessed automobiles or otherwise constitute commercial reasonableness. Because the trial court did not tell the jury what those factors or elements were, the only way the lay jury would have known what they were would have been from evidence such as testimony by someone with expertise in the subject. Without being instructed as to factors or elements of a commercially reasonable sale or having expert evidence of them, the jury could only speculate as to what the factors were and how to tell if the evidence met legal requirements.

The Court says that by the court of appeals' reading of the second sentence of the second paragraph—"A sale is commercially reasonable if it conforms to reasonable commercial practices among dealers in the type of property that was the subject of the sale"—the court of appeals converted one of UCC Article 9's safe harbor provisions into a mandatory condition of proof. The Court reasons that "if" cannot mean "only if" because then the first sentence of the second paragraph and the third paragraph of (a) would be superfluous. Respectfully, I disagree with the Court's reasoning. First, reading the "if" to be "only if" merely reinforces the fact that the sentence is a definition. Second,

reading "if" in such manner simply does not make the first sentence of the second paragraph and the third paragraph of (a) superfluous. Rather, as is noted above, such a reading makes the instruction and definitions under (a) a clear, understandable, and logical set of instructions by which the jury could measure the evidence. Third, if there was an erroneous conversion of a safe harbor provision into a mandatory condition of proof, it was done by the trial court in its charge, in a question on which Regal had the burden of proof, and without objection from Regal. Regal, however, maintains in this Court that the instructions under (a) are legally correct.

The real difficulty here is that Regal did not have a qualified expert witness testify as to what were reasonable commercial practices among dealers in the same type of property that Regal was liquidating, or that Regal's actions conformed to such practices. The jury and the parties were bound by the charge. This Court should be also.

Contrary to the Court's characterization of the court of appeals' opinion, the court of appeals adhered to the record before it, the jury charge as given, and well-established principles in reaching its result. The court of appeals' analysis that the third paragraph defines "commercially reasonable" fits with the surrounding instructions in (a) and is logical:

> [T]he charge submitted in this case states that a sale is commercially reasonable if it conforms to the dealer standard. The plain meaning of this language does not suggest that the dealer standard is either a safe harbor or an otherwise optional standard, or that any other factors may even be considered, let alone balanced, but instead that a sale is commercially reasonable if (and thus, only if) the dealer standard is met.

Regal's contention would thus not only render the *definition* submitted in the charge meaningless, it would authorize a reviewing court to measure the sufficiency of evidence against a different standard than was submitted to the jury. . . .

246 S.W.3d at 750–51 (emphasis added).

In sum, under this record I would hold that the instruction that a commercially reasonable disposition was one that conformed to reasonable commercial practices among dealers in the type of property involved in the sale was a definition. The jury was bound to use that definition. Because there was no evidence that Regal's sales were commercially reasonable as defined by the charge, I would affirm the court of appeals' judgment on that issue.

## II. Evidence to Prove Another Standard for Commercial Reasonableness

Even if the Court is correct and the charge did not define "commercially reasonable" sales but only provided an alternative way in which they could be proven, then evidence such as testimony from an expert would have been necessary for the jury to know if Regal's sales were commercially reasonable.[2] That is because, as previously noted, the issue involves matters beyond jurors' common understanding and there is no other standard expressed in the charge. *See Mack Trucks*, 206 S.W.3d at 583; *Fulgham*, 154 S.W.3d at 89; *Turbines, Inc. v. Dardis*, 1 S.W.3d 726, 738 (Tex.App.-Amarillo 1999, pet. denied). Because the jury was allowed to determine Regal's sales were commercially reasonable in the absence of evidence from which it could properly tell whether "Every aspect of [each] disposition, including the

method, manner, time, place and other terms" conformed to reasonable commercial practices among dealers in repossessed vehicles, and in the further absence of evidence establishing either another standard for commercially reasonable sales or from which it could properly tell how to determine if Regal's sales were commercially reasonable, then the jury's finding can only have been based on some unknown standard at which it arrived by speculation.

The evidence showed how James Wright disposed of the automobiles for Regal, that Wright had used those sales methods for many years, that he had previously sold a great number of vehicles using some or all of the methods, and that some of the general methods he used, such as auction or private sale, were acceptable to other witnesses. But more was required. There must have been evidence that Wright's general methods were commercially reasonable and also that "[e]very aspect of [each] disposition, including the method, manner, time, place and other terms" was commercially reasonable. There was no way for the jury to know if his methods and every aspect of them were commercially reasonable because it was not given standards by which it could tell if they were. Accordingly, I would hold that the evidence is legally insufficient to support a finding that Regal's sales were commercially reasonable, even apart from the lack of evidence to support a finding that Regal's sales were commercially reasonable under the definition in the charge.

## III. Conclusion

I would affirm the judgment of the court of appeals as to damages Regal claims

---

**2.** I agree with the court of appeals that sales might be proven commercially reasonable under some combinations of facts and jury charge language absent expert witness testi- mony. 246 S.W.3d at 752 n. 9. Such a combination of facts and charge language is not present here.

based on the jury's answers to Questions 6(a) and 6(b) and consider the remainder of the issues presented by the parties.