In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-12-00315-CV
_____

JOHN BERGENE, Appellant

V.

COMMUNITY BANK OF TEXAS, N.A., Appellee

On Appeal from the 136th District Court
Jefferson County, Texas
Trial Cause No. D-182,616

MEMORANDUM OPINION

Appellant John Bergene appeals from the district court's judgment in favor of Community Bank of Texas, N.A. In one issue, Bergene challenges the legal and factual sufficiency of the evidence to support the trial court's judgment. We affirm the judgment of the trial court.

## Background

John Bergene was the limited partner and sole principal of E.J. Ventures, LLP (EJ Ventures), a company that provided shipping and towing services. At issue in this case are a number of loan agreements that EJ Ventures entered into with Community Bank, which totaled $2,650,000. To secure this indebtedness, EJ Ventures executed first preferred ship mortgages in favor of Community Bank, pledging as collateral two towing vessels—the MV Alois and the MV Gale Force. Bergene personally guaranteed the loans.

EJ Ventures became delinquent in its payment of the loans, and in August 2008, Community Bank declared the loans in default and sought writs of attachment from a foreign court in the Netherlands to seize both the Alois and the Gale Force. In accordance with judgments obtained from the Civil-Law Division Court of Rotterdam, the vessels were seized while they were performing towing services in the Netherlands. Because the foreign court had seized the vessels, EJ Ventures was unable to continue using the vessels to perform its contracts and filed for bankruptcy relief in the Eastern District of Texas. The bankruptcy proceeding automatically stayed the Bank from continuing its proceedings in the foreign court related to the seizure of the vessels. The Bank filed a motion for relief from the stay, but EJ Ventures objected to the motion. The parties entered into a written

2

agreement that provided, among other things, Bergene an opportunity to seek a buyer for the vessels or otherwise obtain third party financing in an attempt to avoid the foreclosure sale of the vessels. Bergene was unable to locate a buyer for the vessels or secure other financing.

Thereafter, the bankruptcy court authorized Community Bank to proceed with the foreclosure sale of the vessels. Because of the liability issues associated with boats, the Bank formed CBoT Maritime Holdings, Inc. as a subsidiary to bid on the vessels at the foreclosure sale. At the foreclosure sale, CBoT purchased both vessels for the aggregate sum of $1,970,000—$1,500,000 for the Gale Force and $470,000 for the Alois.

After Community Bank applied these amounts to EJ Venture's outstanding debt, there remained a deficiency of $904,363.64 due and owing to Community Bank. Community Bank filed suit against Bergene, as a guarantor of the notes, to recover the remaining unpaid balance. After a bench trial, the trial court issued separate Findings of Fact and Conclusions of Law. The trial court entered a final judgment in favor of Community Bank and found that the Bank should recover $904,363 from Bergene, plus interest and attorney's fees. The trial court entered forty-four Findings of Fact. The following Findings of Fact are relevant to the disposition of this appeal:

3

28. On January 20, 2009, the Netherlands' Civil Law Division Court in Rotterdam, proceeded with a sale of the vessel MV Alois for the purchase price of 400,000 Euros with the purchaser being CBoT Maritime Holdings, Inc., a wholly owned subsidiary of the Bank.

29. On March 17, 2009, the Court, likewise, proceeded with a sale of the vessel MV Gale Force at a purchase price of 875,000 Euros with CBoT Maritime Holdings, Inc. also the purchaser. The preponderance of the evidence establishes that the purchase price for each vessel bore a reasonable relation to the fair market value of the vessel under the totality of the circumstances.

30. CBoT Maritime completed a post purchase inspection of the vessels to determine whether the vessels were seaworthy in order to return to the United States. The inspection revealed that the vessels were in disrepair and that substantial repairs would be necessary.

. . . .

34. The Bank applied the net proceeds received from the sale of the vessels (to CBoT Maritime) against the indebtedness due and owing from the Company. After all offsets and credits, the total indebtedness due the Bank is $904,363.64[.]

. . . .

39. The Defendant's operative pleadings do not include defenses and/or affirmative defenses (including avoidance defenses), based on Texas law applicable to disposition of personalty collateral, including, the provisions of Chapter 9 of the Texas Business & Commerce Code.

Bergene has appealed the court's judgment, and essentially challenges the legal and factual sufficiency of the trial court's finding that "[t]he preponderance of the evidence establishes that the purchase price for each vessel bore a reasonable

4

relation to the fair market value of the vessel under the totality of the circumstances."

**Legal and Factual Sufficiency**

A trial court's findings of fact are reviewable for legal and factual sufficiency under the same standards of review used to review the sufficiency of the evidence supporting a jury's findings. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). In a legal sufficiency review, we review the evidence in the light most favorable to the trial court's findings, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder." *Id.* at 822.

In a factual sufficiency review, we consider and weigh all evidence in a neutral light and will set aside the finding only if the evidence is so weak or the finding so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Ortiz*, 917 S.W.2d at 772. We defer to a trial court's

factual findings if they are supported by evidence. *Perry Homes v. Cull*, 258 S.W.3d 580, 598 (Tex. 2008).

Federal law generally governs the enforcement of preferred ship mortgage liens. *See Bollinger & Boyd Barge Serv., Inc. v. Motor Vessel, Captain Claude Bass*, 576 F.2d 595, 597 (5th Cir. 1978); *J. Ray McDermott & Co. v. Vessel Morning Star*, 457 F.2d 815, 818 (5th Cir. 1972); *see also* 46 U.S.C. §§ 31301-31343 (2012). Specifically, federal law governs the determination of a deficiency judgment and judicial sale procedures in a maritime lien case. *Walter E. Heller & Co. v. O/S Sonny V.*, 595 F.2d 968, 971 (5th Cir. 1979). A defendant's allegation that the price at a judicial sale was inadequate, standing alone, does not entitle the defendant to a fair value offset. *See id*. at 971-72. "Deficiency judgment suits should not be turned into valuation cases absent at least a preliminary showing of a probable significant disparity between the sales price of the [collateral] and its fair value." *Id*. at 972.

Bergene does not dispute that the mortgages at issue are preferred ship mortgages. Instead, Bergene contends that Texas law is applicable because article II, section 8(b) of the ship mortgages at issue here expressly states that the mortgages "shall in all respects be governed by and construed in accordance with the laws of the State of Texas." According to Bergene, this choice-of-law provision

6

requires Community Bank to comply with the Uniform Commercial Code in the disposition of the collateral vessels. Bergene argues that Community Bank failed to comply with Texas law when it acted in a commercially unreasonable manner and purchased the vessels at the foreclosure sale for an arbitrary and unreasonable price that was 50% below the vessels appraised market value.

The UCC requires a secured creditor to be commercially reasonable in all aspects of collateral disposition, including the "method, manner, time, place, and other terms[]" of the disposition. Tex. Bus. & Com. Code Ann. § 9.610(b) (West 2011). For a secured creditor to recover a deficiency judgment, it must prove it disposed of the collateral in a commercially reasonable manner. *Regal Fin. Co. v. Tex Star Motors, Inc.,* 355 S.W.3d 595, 599 (Tex. 2010); *see* Tex. Bus. & Com. Code Ann. § 9.610. For a secured party to enforce its security interest against collateral, it generally must "proceed in good faith," give "reasonable notification[,]" and act "in a commercially reasonable manner[.]" *See* Tex. Bus. & Com. Code Ann. § 9.625 cmt. 2 (West 2011). A secured creditor's actions may be commercially reasonable even if it could have obtained a greater amount in choosing a different time or method for the collateral disposition. *Id.* § 9.627(a). A secured creditor's disposition is commercially reasonable if the creditor makes the disposition "(1) in the usual manner on any recognized market; (2) at the price

7

current in any recognized market at the time of the disposition; or (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." § 9.627(b).

In this case, the Netherlands' Civil Law Division Court seized both vessels and eventually proceeded with foreclosure of the vessels. In the foreclosure judgment regarding the Alois, the foreign court found that the "time-periods and formalities prescribed by law have been observed[]" and the "sale was effected in a legally valid manner[.]" In the foreclosure judgment regarding the Gale Force, the foreign court likewise found that the "statutory time periods and formalities have been observed[]" and the "sale was effected in a legally valid manner[.]" Bergene does not contend that the foreclosure proceeding was improperly noticed, advertised, or otherwise invalid. Bergene only complains of the price bid and obtained by Community Bank at the foreclosure sales, where Community Bank was the only participant in the auctions. Community Bank responds that the UCC does not apply because federal law preempts it, and alternatively, if the UCC does apply, there is substantial evidence to support the trial court's finding that the bid amount was reasonable and bore a reasonable relationship to the fair market value of the vessels.

The trial court heard evidence addressing commercial reasonableness at trial. Mark Underhill, a marine surveyor, testified on behalf of Bergene regarding his valuation of the vessels. Underhill testified that he drafted an appraisal survey for the Alois in June 2006 and revised it in August 2008. In his June 2006 report, Underhill gave the Alois a market value of $750,000. Underhill testified that Bergene asked him to reevaluate the Alois after the vessel received some repairs. The August 2008 report states, "The owner has reported to the undersigned that since the last survey the vessel was drydocked and the hull was sandblasted to white metal and coated. The vessel has also undergone an ABS special survey and the towing winch was rebuilt." Underhill determined the value of the Alois had increased to $850,000. But in his August 2008 report, Underhill states that his conclusions assume the Alois was "in the same or better condition" than it was in for the June 2006 survey.

Underhill testified he also drafted two appraisal surveys for the Gale Force. In his November 2007 report, Underhill gave the Gale Force a market value of $2,150,000. He again reevaluated the Gale Force in August 2008 after EJ Ventures made some repairs to the vessel. Underhill testified that Bergene gave him work receipts as proof that he had actually made the repairs to the vessel. Underhill testified that he based his reevaluation of the Gale Force on the repair work

indicated in the receipts. The 2008 report indicates that the owner of the Gale Force told Underhill that he spent over $500,000 on non-required repairs to the Gale Force since the 2007 report. Underhill's report also notes that the market value of vessels similar to the Gale Force had increased generally. In his 2008 report, Underhill concludes that the Gale Force's market value had increased to $2,700,000. Similar to the reports concerning the Alois, Underhill again notes that he based his conclusions on the assumption that the condition of the Gale Force was "in the same or better condition" than it was in for the 2007 survey.

Underhill testified that when he reevaluated the vessels, he understood that he could not physically inspect the vessels because they were under contract in Europe. Underhill did not verify the authenticity of the receipts Bergene provided to him for his 2008 updated reports. Underhill had no other information about the vessels' conditions. Underhill testified that the flagging of a vessel could also affect its value, but admitted that he did nothing prior to his evaluation or his reevaluation of the vessels to verify their flagging status.[1] While Underhill's 2008

---

[1] "A ship has the nationality of the state that registered it and authorized it to fly the state's flag, but a state may properly register a ship and authorize it to fly the state's flag only if there is a genuine link between the state and the ship." RESTATEMENT (THIRD) FOREIGN RELATIONS LAW OF THE UNITED STATES § 501 (1987). "Under international law, the flag state is responsible for adopting and enforcing laws to protect the welfare of the crew and passengers aboard a ship and to maintain good order thereon, and for ensuring that activities aboard the ship do

reports clearly state that they were based on the assumption that the vessels were in the same or a similar condition as when he first surveyed the vessels, Underhill provided no testimony to the court to indicate that his assumptions were valid.

Geert Visser testified on behalf of Community Bank regarding his valuation of the vessels. Community Bank retained Visser to assist in selling the Alois and the Gale Force. Visser testified that he was familiar with the condition of the vessels at the time they were seized. He could not recall exactly when he first saw the vessels. He testified he could have inspected the vessels as late as twelve months after they had been seized, or as early as one month or fourteen days after they had been seized. Visser testified that he walked through both vessels and they were both "in horrible condition[;]" and that both vessels were a "total disaster[.]" He testified that there had been no maintenance done on the vessels. It appeared to Visser that EJ Ventures had not properly maintained the vessels for six to eight months. Visser testified that the Gale Force was not able to conduct a towage in the condition in which he found it. Visser testified he had a survey performed on the vessel that confirmed that the vessel was in a "horrible condition" and estimated it would cost $450,000 to repair the Gale Force and make it seaworthy.

not endanger other ships or the marine environment. This responsibility continues at all times, wherever the ship is located." *Id.* § 502 cmt. a.

11

Visser stated that he did not see any evidence of the repairs and improvements allegedly done to the Gale Force in 2008.

Visser explained that the market for these vessels was "[v]ery bad[]" and had started to decline before the vessels had been seized. Visser testified that he was attempting to sell the vessels on behalf of CBoT. He testified that he could sell the Alois only at "scrap value." Visser testified that the highest offer he had received for the Gale Force—$400,000—was way too low a price for the vessel.

George Casseb, senior executive vice-president of Community Bank, testified that the Bank has not received any offers to purchase the vessels since they were seized "that even approaches what the bank bid at the foreclosure sale." Casseb testified EJ Ventures owes the Bank $904,363.64. Casseb explained that the Bank applied $1,970,000 in total offsets, which represents the net proceeds from the sale of both vessels.

Casseb testified that the Bank did not obtain any additional surveys or seek third-party valuations of the vessels prior to the foreclosure sale. Casseb testified that in determining what CBoT should bid on the vessels, he looked at the cost of the vessels, the cost for holding the vessels, attorney's fees, and broker's fees. Casseb testified that while the amount CBoT bid on the vessels was a discretionary call, it was also a "correct asset call for the bank on a problem." Casseb testified

12

that the Bank did not get any input from Visser on what amount it should have bid for the vessels at the foreclosure sale. Casseb did discuss the condition of the vessels with Visser and was aware of the foreign flag issue, which significantly influenced the value of the vessels. When asked if the Bank had arbitrarily chosen what amount to bid at foreclosure, Casseb responded, "I would say we were light in what we charged[]" and that "the bank made a prudent decision." Ultimately, Casseb believes he bid "way too high" for the vessels. He testified that the Bank has spent hundreds of thousands of dollars for repairs to the vessels.

Bergene testified that on December 19, 2007, EJ Ventures originally purchased the Gale Force for $1,200,000.[2] After EJ Ventures purchased the Gale Force, it made a number of improvements and upgrades, spending over $500,000. In late July, early August 2008, the American Bureau of Shipping (ABS) had just completed its inspection, and the Alois was dry-docked to make the necessary repairs. EJ Ventures repaired the propeller and the cutlass bearing. It also had the Alois cleaned and painted prior to its seizure.

Bergene testified that after the Alois was seized, its crew remained on board for almost three months, unable to leave the boat until they were paid for wages due, which he offered as a possible reason to explain the apparent condition in

_____

[2] At the time EJ Ventures purchased the Gale Force, its name was the "Mr. Nick."

13

which Visser found the vessel. Bergene was working on the Gale Force when the Netherlands' court ordered it seized. The Gale Force had just completed a trip when the Coast Guard stopped it for an inspection and found some deficiencies that Bergene had to address before the vessel could leave the port. Bergene testified that he had completed approximately 90% of the items on the Coast Guard's list prior to the vessel's seizure. He testified that one hour prior to the Gale Force's arrest, he was in the Coast Guard's office addressing the remaining items on the list. He had employed two to three service support people to work on the remaining issues. Bergene testified that he was addressing those items with some degree of urgency because he had a tow scheduled for the Gale Force four to five days later.

Bergene testified that he has been in the maritime industry for thirty-two years. He has a master certificate and had sailed as a master for seventeen years. He also acts as a marine warranty surveyor drafting trip tow surveys, including wet and dry tows of drilling rigs. He explained that as a warranty surveyor, he inspects the equipment and the tow to make sure it is seaworthy. A surveyor also inspects the equipment to confirm proper maintenance and capability of performing tows. Against these credentials, Bergene testified that he disagreed with Visser's testimony that the Alois and the Gale Force were in horrible condition when they

14

were seized. Bergene questioned Visser's qualifications and explained that Visser had never sailed a vessel, had never held a seaman's license, had never spent a day at sea, had never been involved in working on equipment, and had never been involved in running equipment or owning equipment. Bergene testified that people who are ignorant of the industry do not understand the actual operational aspect of the vessels and look more at their aesthetics.

To further attack the credibility of Visser, Bergene described an encounter he had with Visser on some tows that Visser had brokered for EJ Ventures during the spring and early summer months of 2008. Bergene testified that although it was customary for a broker to receive a 2.5% commission, Visser had charged him a 5% commission for some jobs. When Bergene confronted Visser about this discrepancy, Visser explained that the commission was higher because he was splitting it with another broker in Europe. When Bergene contacted Visser's alleged European partner, the alleged partner denied any partnership with Visser. Within a few days of Bergene confronting Visser, the Coast Guard boarded the Gale Force, without notice, at the Rotterdam Port. Bergene testified that this was the first time in his career that the Coast Guard had boarded his vessel in this manner, without advanced notice of the inspection. Bergene's testimony suggests that Bergene believed Visser was responsible for the unusual boarding.

15

Bergene testified that he was aware that the Gale Force had lost its Jones Act privileges before he purchased the vessel. Bergene testified that both vessels were ABS class vessels. Bergene explained that the ABS is a regulatory body implemented by the United States government. He testified that both the Alois and the Gale Force had passed their yearly inspections. Before any ocean voyage, a warranty surveyor is required to inspect the tow and the item to be towed for seaworthiness and to make sure the equipment is secured correctly. The surveyor also inspects the tow wires, the equipment, the machinery list, the maintenances, and the navigations. This inspection is required to get a trip tow certificate to leave the harbor.

Bergene also testified that the vessels contained other assets that would have increased their value. He listed those assets to include fuel, spare parts, electronics, and food. He testified the vessels should have had at least a minimum of 20% reserve fuel. He believed the Alois would have had at least 10,000 gallons of fuel and the Gale Force would have had a minimum of 17,000 or 18,000 gallons of fuel. He testified the average price for fuel at that time would have been $4.30 a gallon. Bergene testified that he estimates that there was between $75,000 and $80,000 in spare parts on both vessels. It was his opinion that Community Bank had not accounted for these items in its valuation of the vessels.

16

On cross-examination, Bergene admitted he had no records to document the amount of fuel remaining in the ships. Moreover, Bergene admitted that he did not list any of these items as assets of EJ Ventures in his bankruptcy court schedules. Bergene admitted that if there had been any assets disclosed, they would have belonged to the Chapter 7 trustee and he would not be entitled to offsets related to the assets.

On the record before us, viewing the evidence in the light most favorable to the trial court's findings, the evidence is legally sufficient to support the trial court's finding that the purchase price of the vessels—$1,500,000 for the Gale Force and $470,000 for the Alois—bore a reasonable relation to the fair market value of the vessels. The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See City of Keller*, 168 S.W.3d at 819. A reasonable factfinder could have resolved the inconsistences in the testimony by attaching little weight to Bergene's and Underhill's testimonies about the condition of the vessels. The trial court was presented testimony that Underhill's 2008 evaluation of the vessels was based on an assumption that the vessels remained in the same or better condition than when he had last seen them in 2006 and 2007. Underhill also testified that his 2008 valuations of the vessels were based on Bergene's representations about repairs and modifications that had

17

been completed on the vessels. Underhill did nothing to confirm his assumptions or independently verify Bergene's representations before preparing his 2008 valuations. Visser testified that at the time he inspected the vessels, he did not see any evidence of the improvements or repairs alleged by Bergene. The trial court could have disregarded Underhill's valuation as unreliable. The remaining evidence is legally sufficient to support the trial court's findings.

Visser testified that when he first inspected the vessels subsequent to seizure by the Bank, the vessels were not seaworthy and were in a "horrible" condition. He testified that the Gale Force had to tow the Alois back to the United States. The trial court received testimony that seven to eight months before the Gale Force was seized, EJ Ventures purchased the Gale Force for $1,200,000. Visser testified he saw no evidence of improvements to the vessel. Visser testified that in the condition he found the Alois, its value was only "scrap." Community Bank presented evidence that among other factors, it considered the cost of the vessels, as well as the condition of the vessels in determining what amount to bid at the foreclosure sale. Further, there is evidence in the record that the disposition of the vessels was conducted in conformity with the procedures mandated by the courts in whose jurisdiction the vessels were arrested and attached. There is no evidence in the record that Community Bank failed to give proper notice or failed to

18

advertise the sale in a recognized market. When the auction was advertised and conducted in a proper manner, the failure of third-party bidders to respond may itself be an indication of the market value of the vessels offered for auction. We conclude that the evidence is not so weak, and the controverting evidence is not so strong, as to make the trial court's findings clearly wrong and unjust; therefore, the evidence is also factually sufficient to support the trial court's findings. We overrule Bergene's issue and affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on December 13, 2012
Opinion Delivered June 13, 2013

Before Gaultney, Kreger and Horton, JJ.

19