

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00388-CV

SUNTRUST BANK                                                          APPELLANT

V.

MARK A. MONROE                                                         APPELLEE

----------

## FROM COUNTY COURT AT LAW NO. 2 OF DENTON COUNTY
## TRIAL COURT NO. CV-2014-02417

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellant SunTrust Bank sued Appellee Mark A. Monroe for breach of contract based on his failure to make payments on an Aston Martin, which it repossessed and sold before seeking a deficiency judgment against him. Monroe counterclaimed for damage to his credit, and a jury trial resulted in a

[1]*See* Tex. R. App. P. 47.4.

take-nothing judgment.   In three issues, SunTrust appeals the trial court's judgment.  We affirm.

## II.  Background

### A.  Procedural Background

SunTrust asserted in its unverified original petition on its breach-of-contract claim that all conditions precedent had been performed or had occurred and requested judgment for $92,541.52 "as the principal amount due on the contract," for $7,500 in attorney's fees, for pre- and post-judgment interest, and for court costs.[2]  *See* Tex. R. Civ. P. 54 (stating that "it shall be sufficient to aver generally that all conditions precedent have been performed or have occurred"); *cf.* Tex. R. Civ. P. 185 (stating that claim for liquidated money demand based upon written contract on which a systematic record has been kept and is supported by affidavit that such claim is just, true, due, and that all just and lawful offsets, payments, and credits have been allowed "shall be taken as prima facie evidence thereof, unless the party resisting such claim shall file a written denial, under oath").

Monroe responded with a general denial and counterclaimed, asserting that SunTrust had taken possession of the vehicle but had failed to provide him with notice of the foreclosure, including its date, time, and place or any other notice regarding the collateral's disposition, despite his having twice requested

---

[2]SunTrust amended its petition a year later, changing its attorney's fee request to $10,000 and attaching a copy of the contract.

such information.  Monroe raised the affirmative defenses of failure to mitigate, failure to comply with the business and commerce code, laches, estoppel, waiver, and offset.[3]  Monroe complained that SunTrust's actions had affected his ability to obtain credit and had caused not less than $20,000 in damage to his credit.

Monroe also sought summary judgment.[4]  SunTrust both responded and separately sought summary judgment on its own behalf, attaching summary

---

[3]If a creditor pleads that the disposition of the collateral was commercially reasonable or generally avers that all conditions have been performed or have occurred, the debtor must then specifically deny commercial reasonableness or other conditions precedent—such as notice—in its answer for the creditor to be required to prove that the disposition of the collateral was commercially reasonable or any of the other challenged conditions precedent.  *See Greathouse v. Charter Nat'l Bank-Sw.*, 851 S.W.2d 173, 176–77 (Tex. 1992).  Monroe complained in his answer that he had twice requested the underlying notice and disposition information "required under Section 9.601, et., seq.," and asserted, in what appears to be a typo, that SunTrust had failed "to comply with Section 6.01 of the *Texas Business and Commerce Code*."

[4]In his motion and amended motion for summary judgment, Monroe specifically argued that SunTrust had failed to comply with business and commerce code sections 9.611 (notification before disposition of collateral) and 9.614 (contents and form of notification before disposition of collateral) because he was not provided with notice as to the time or place of the sale and that the sale of the collateral was for substantially less than its value.  He also argued that because the sale was not commercially reasonable, any and all amounts due and owing should be negated under section 9.626.  Before trial began, Monroe pointed out these grounds, and the trial court stated to SunTrust's counsel, "I think that they certainly did give you notice of the fact that they were going to bring this up."  The questions of commercial reasonableness and sufficiency of notice were included in the jury charge without objection.  *See* Tex. R. Civ. P. 67 ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."); *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 495 (Tex. 1991) (explaining that a party who allows an issue to be tried by

3

judgment evidence to both its motion and its response.[5] The trial court denied Monroe's motion and did not rule on SunTrust's motion.

Monroe requested a jury trial. The one-day trial began on Thursday, May 26, 2016.[6] During his opening statement, SunTrust's counsel told the jury that the evidence would show that the parties had a valid contract that Monroe had breached and that SunTrust had repossessed the vehicle, had given Monroe "all the proper notices," had disposed of the vehicle in a commercially reasonable manner, and was entitled to the deficiency owed by Monroe.

Monroe countered in his opening statement by stating that the case would not be before a jury if it were that simple and that the evidence would show that the vehicle, worth $233,305.46 at purchase, was repossessed seven months later and then sold either in 2013 or 2015 for around "fifty cents on the dollar" for $115,000 by third parties who did the actual repossessing and sale. He told the jurors that it would be their job to decide whether that sale was commercially reasonable when none of the evidence would show the vehicle's condition at

_____

consent and fails to raise lack of a pleading before submission of the case cannot later raise the pleading deficiency for the first time on appeal).

[5]Not all of the items attached to SunTrust's motion or response were offered or admitted into evidence at trial and are thus not considered part of the record that we review in its sufficiency challenges to the jury's findings.

[6]SunTrust's counsel stated that he was filling in for the attorney who had previously worked on the case and had not been assigned the case until three days before trial began. He did not request a continuance but instead announced ready.

repossession, the fees or expenses that SunTrust claimed to have incurred, or "anything relating to" the vehicle's private sale. Monroe stated that the matter had gone to trial because, while he had no problem paying what was fair and reasonable, what SunTrust sought was unfair and unreasonable.

## B. Trial Evidence

On October 18, 2012, Liberty Redevelopment Group LLC, via Monroe, the owner and operator of Delta Bail Bonds, made a down payment of $41,978.42 on a new 2012 Aston Martin V12 Vantage, VIN SCFEBBCF9CGS01050. Liberty bought the vehicle from Aston Martin of Dallas for $233,305.46 under a retail installment sales contract for 72 monthly payments of $2,657.32 starting November 21, 2012, financing $173,109.37 of the vehicle's purchase price. At the time, Monroe was acting both as Liberty's officer and as a co-buyer,[7] but Quinntin Augustine, Liberty's primary owner, actually drove the vehicle, which was intended to be a business vehicle. Monroe drove it once. Aston Martin assigned its rights under the contract to SunTrust.[8]

---

[7]By the time of the trial, Monroe was no longer one of Liberty's officers. Monroe said that when he signed the contract, his understanding was that Liberty was going to make the payments and that he was a guarantor; he acknowledged that he knew he was going to have to pay back the loan if Liberty did not. The parties' contract states, "A co-buyer is a person who is responsible for paying the entire debt."

[8]The contract provided that in the event of default, the vehicle could be repossessed and sold to recover part of the loan. It also allowed for the recovery of reasonable attorney's fees and court costs if SunTrust had to sue to enforce the contract and "reasonable out-of-pocket expenses incurred in connection with retaking, holding, and selling the vehicle as the applicable law allows."

Less than two months after Liberty and Monroe purchased the vehicle, SunTrust issued to Monroe its first notice of its intent to accelerate the debt. Monroe received neither this notice nor the second one that SunTrust sent later the same month. Ultimately, only two payments were made on the debt. Monroe did not make any of the payments after Liberty defaulted.[9]

Monroe received SunTrust's third notice of its intent to accelerate the debt and its May 3, 2013 notice of its plan to sell the vehicle at a private sale "sometime on or after May 19, 2013." The May 3, 2013 notice also included the following itemized list of the amounts due:

| | |
|---|---|
| Unpaid Principal Balance | $169,349.22 |
| Interest | $1,658.14 |
| Late Charges | $391.96 |
| Repossession Expenses | $750.00 |
| Accumulated Fees and Costs[10] | $176.19 |
| TOTAL | $172,325.51 |

The notice also informed Monroe that interest would continue to accrue at a daily rate of $15.50 and that storage fees would accrue at a daily rate of $25.00, included a statement that "[t]o learn the exact amount you must pay, call us at

[9]Monroe testified that when he received notice that payments on the vehicle were not being made, he called Liberty and explained in "not really polite terms" that he wanted the debt paid and that it was Liberty's responsibility. He had expected Liberty to take care of the payments or to cover any deficiency to the extent that the vehicle was repossessed and sold. Monroe said that SunTrust had not sued Liberty on the debt.

[10]This line item included a notation that the accumulated fees and costs "may include NSF fees, collection fees[,] and attorney fees to the extent permitted by law."

6

866-717-0734," and informed Monroe that he could get the collateral back at any time before it was sold by paying the full amount owed, including the repossession expenses. SunTrust's letter informed Monroe that if he wanted a written explanation of how the amount he owed was calculated, he could call SunTrust at the phone number listed in the letter or write to SunTrust at the address set out in the letter.

Monroe stated that although he received the May 3, 2013 notice, SunTrust had never given him anything that would show other attempts to sell the vehicle—either on the Internet, via the newspaper, or on a dealer lot—and that he had received no documents about the vehicle's actual sale. Monroe also testified about his understanding of a "dealer's auction" and a "private sale," explaining that he thought that a dealer's auction was public only as to dealers or anyone who could buy his or her way into access to the auction, while a "private sale" was trying to sell the car in a retail manner to a private individual. Monroe said that he had not seen any documents regarding the sale and had no idea how SunTrust had actually sold the car except for the letter saying that it would be sold sometime after May 19, 2013.

The loan transaction details were admitted into evidence. With regard to the vehicle loan's pay history, on May 10, 2013, SunTrust listed a second repossession fee of $750. On May 16, 2013, and July 10, 2013, SunTrust listed a "waiver" of $926.19 and $391.96, respectively. On July 18, 2013, SunTrust listed a charge-off of $172,185.11, and a "DLR RESV REBATE" of $3,818.07.

7

On October 17, 2013, SunTrust zeroed out the account. No one testified about the meaning of any of these terms.

On November 2, 2013, SunTrust issued to Monroe an explanation of its calculation of the deficiency he owed, informing him that the vehicle had been sold and that the sale's proceeds had been applied to the loan as of the date of sale, October 24, 2013. It set out the following itemized costs to show the deficiency as of October 24, 2013:

| | |
|---|---|
| Aggregate Amount of Obligation as of October 24, 2013 | $173,703.77 |
| LESS PROCEEDS FROM SALE | ($115,000.00) |
| **TOTAL OUTSTANDING BALANCE** | **$58,703.77** |
| PLUS Repossession Expenses[11] | $38,942.30 |
| PLUS Accumulated Fees and Costs[12] | $176.19 |
| PLUS Late Charges | $391.96 |
| LESS Miscellaneous Rebates & Credits[13] | ($0.00) |
| **DEFICIENCY OR (SURPLUS) on October 24, 2013** | **$98,214.22** |

---

[11]This line item included a notation that repossession expenses "may include known expenses of retaking, holding, preparing for sale, processing, and disposing of Collateral to the extent permitted by law."

[12]This line item included a notation that the accumulated fees and costs "may include NSF fees, collection fees[,] and attorney fees to the extent permitted by law."

[13]This line item included a notation that the miscellaneous rebates and credits may "include known rebates of interest and credit service charges."

SunTrust's notice informed Monroe that for each day that the deficiency remained unpaid, interest would continue to accrue at the contract rate of interest at $8.47 per day and that if he failed to pay the deficiency, SunTrust could retain an attorney to file suit and that he might be obligated to pay SunTrust's attorney's fees and costs incurred in collecting the deficiency. The notice included contact information in the event Monroe had any questions and was sent via certified mail. Monroe signed for it on November 11, 2013.

As the vehicle's co-owner, Monroe testified that he would have expected the car to sell for $165,000 to $175,000 because the car was only six months old at the time it was repossessed. Monroe initially testified that he based his valuation on Kelly Blue Book's retail value of the car and NADA Black Book's wholesale value, but he subsequently noted that he had also looked online because he did not think Kelly Blue Book had enough data on sales of that vehicle. Monroe testified that any deficiency after the foreclosure should have been minimal and described his reaction as one of disbelief when he realized that the vehicle had been sold for $115,000.

Monroe testified that as a bail bondsman, he occasionally had to repossess collateral and that the $38,942.30 amount for "repossession expenses" listed by SunTrust was excessive. According to Monroe, that amount was higher than any repossession fee he had ever seen, and he added that he

"wouldn't get away with that in court."[14]  Monroe said that SunTrust had never given him a single check or receipt that showed SunTrust had paid over $38,000 to anyone for the repossession.

With regard to the $176.19 in "accumulated fees and costs," Monroe stated that he had not seen any checks or invoices to show that SunTrust had paid that sum of money or that anyone had charged SunTrust that amount.  But he agreed that the $391.96 in late charges was probably fair and accurate if there were missed payments.

Monroe opined that while he had received fair and adequate notice of SunTrust's repossession of the vehicle, SunTrust did not adequately notify him of what it intended to do with the vehicle once SunTrust repossessed it.  SunTrust did not provide him with any follow-up notice informing him of the time, date, place, or anything else about where the sale would occur, which Monroe said was a problem for him because he had been trying to obtain the money to buy the vehicle at a reasonable price so that it would not hurt his credit.[15]  Monroe asked the jury to find the debt null and void "because of [SunTrust's] ridiculous sort of process on taking and selling the car and -- and justifying their expenses and -- it just seems absurd that a -- a bank as big as SunTrust would do this."

---

[14]Monroe acknowledged that he had never collateralized Aston Martin vehicles when issuing a bond.

[15]Monroe said that SunTrust had destroyed his credit score, preventing him from getting a good interest rate when he tried to refinance his house.  He does not appeal the jury's finding that he suffered no loss.

Susannah Kelly, a SunTrust officer and custodian of records, testified that she had personal knowledge of the loan's complete payment history and that two payments had been made that were applied to the balance. Kelly testified that SunTrust hires people to repossess vehicles, that it is common in the banking industry to use a dealer to sell repossessed vehicles, and that SunTrust used the auction house ADESA for its repossessed vehicle sales. She further testified that SunTrust has a department that establishes a floor price for the collateral based on a combination of the NADA Black Book value and the vehicle's condition, that it was not uncommon for SunTrust to authorize repairs on a repossessed vehicle, and that SunTrust authorized repairs on the Aston Martin. Kelly stated that the amount sought by SunTrust was the deficiency balance after the sale of the vehicle and after applying any credits and debits.

Monroe's sole exhibit, which was admitted into evidence, was the affidavit of SunTrust's repossession coordinator manager, Brandy Thore. In the affidavit, Thore stated that she was SunTrust's custodian of books and records relating to the amounts owed to SunTrust and that she was personally familiar with the vehicle's contract, the vehicle, and "the process whereby Suntrust Bank recovered possession of the equipment, sold it, and applied the proceeds to the contract." Thore averred that after attempts to resolve the default failed, SunTrust contracted with PRA Location Services, LLC to repossess the vehicle, that PRA repossessed the vehicle on May 1, 2013, and that after repossessing the vehicle, PRA "filled out a Vehicle Condition Report and presented it to

11

Suntrust Bank. See P-067 through P-070."[16]  Thore then described the notice sent to Monroe that contained the itemization of amounts due.

Thore stated that SunTrust assigned the vehicle to ADESA on May 14, 2013, to ensure that it would be disposed of in a commercially reasonable manner and that ADESA determined that repairs were necessary to get the best possible price for it "[b]ased on the Vehicle Condition Report forwarded to ADESA and ADESA's own independent inspection."  According to Thore, SunTrust authorized the repairs, and after they were made, ADESA determined that the collateral's fair market value was $115,000.  Thore stated that ADESA listed the collateral in its "run list located on the ADESA website," advertised the auction for the collateral in the local newspaper and on its website, and sold the collateral "at a private auction located in Hutchins, Texas, on October 24, 2015." ADESA auctioned off the vehicle to the highest bidder for $115,000.00, and "after all necessary expenses were deducted, Suntrust received $76,807.70."  Thore summarized the sale price and "all necessary expenses" as

| | |
|---|---|
| Vehicle Sale | $115,000.00 |
| Seller Fee | -$ 95.00 |
| EPA Fee | -$ 7.00 |
| Sublet: Transportation | -$ 110.00 |
| Sublet: Transportation | -$ 75.00 |
| Sublet: Mechanical | -$ 23,347.21 |
| Sublet: Mechanical | -$ 14,546.09 |
| Net Amount | $ 76,807.70 |

---

[16]Although the affidavit references various documents, they were not attached or included in the evidence at trial.

Thore stated that she had compared the $115,000 "value with the comparable sales information available to Suntrust Bank and believe[d] the price obtained [wa]s reasonable. See P-064 through P-066." She then summarized the November 2, 2013 explanation of calculation of deficiency that SunTrust sent to Monroe.

According to Thore, ADESA was "utilized by Suntrust Bank to liquidate repossessed passenger vehicles for many years," and Thore described ADESA as "recognized as an expert and industry leader in the vehicle remarketing service industry." She stated that she was personally aware of the process ADESA used to dispose of repossessed passenger vehicles, that she closely monitored ADESA to ensure that it disposed of the collateral in accordance "with its usual process," and that ADESA did so. She opined that the ADESA process was commercially reasonable and that the value received and the manner in which the sale took place "was in conformity with reasonable commercial practices among dealers in the type of property sold." She also opined that the time between repossession and ultimate sale "was reasonable and allowed Suntrust Bank to obtain the best price possible."

## C. Closing Arguments

During closing arguments, SunTrust's counsel argued that Monroe was a sophisticated businessman who knew he would have to pay back the debt if Liberty defaulted on it, that Monroe failed to make payments, and that Monroe

had received the notice that he was entitled to receive. SunTrust's counsel read specific portions of Thore's affidavit to the jury.

Monroe's counsel argued that the jury had to decide whether this was a consumer or commercial transaction and then whether the vehicle, which was approximately seven months old with an original purchase price of $233,305, was sold for $115,000 at a commercially reasonable sale, and if not, what the vehicle's value was. He pointed out that none of SunTrust's witnesses testified about the vehicle's value, and he argued that the vehicle's value, per Monroe's testimony, was $175,000.

SunTrust's counsel, in rebuttal, again argued that Monroe was a sophisticated businessman who had made a bad business deal and now wanted the jury to bail him out. He argued that regardless of what the contract called a "consumer transaction," the transaction at issue was commercial, that the new car depreciated the moment it was driven off the lot, and that just because something is listed on the Internet for a particular price does not mean it will actually sell for that price.

## D. Jury Charge

There were no objections to the court's charge as given to the jury. The charge set out portions of business and commerce code sections 9.610, 9.611, 9.614, 9.625, 9.626, and 9.627 and presented the jury with nine questions, which were answered as follows:

14

- Question 1: Was there a valid contract formed between Aston Martin of Dallas and Mark A. Monroe? *Yes.*

- Question 2: Did Aston Martin of Dallas assign its rights under the contract to SunTrust Bank? *Yes.*

- Question 3: Did Mark A. Monroe breach the contract by failing to make the monthly installment payments under the contract? *Yes.*

- Question 4: Did SunTrust provide Notification under Sec. 9.611 or 9.614 as required by Statute as shown above? *No.*

- Question 5: Was the underlying transaction a consumer transaction? *No.*[17]

- Question 6: Did SunTrust Bank dispose of the collateral securing the underlying contract in a commercially reasonable manner? If no, skip to Question 8. *No.*

- Question 7: What sum of money, if any, if paid now in cash, would fairly and reasonably compensate SunTrust Bank for its damages, if any, that resulted from Mark A. Monroe's breach of the contract? *Skipped* (in compliance with the conditioning instruction in Question 6).

- Question 8: What would be the value of the collateral in a commercially reasonable transaction? *$143,713.85.*

- Question 9: What sum of money, if now paid in cash, would fairly and reasonably compensate Mark Monroe for the damage to his credit? *$0.00.*

## E. Post Trial

SunTrust moved for entry of judgment, seeking an award of $69,500.37, and on July 18, 2016, the trial court held a hearing on the motion. SunTrust's

---

[17]No one challenges the jury's finding that the underlying transaction was not a consumer transaction. *Cf.* Tex. Bus. & Com. Code Ann. § 9.405(c) (West 2011) (noting that section 9.405, "Modification of Assigned Contract," is subject to law other than chapter 9 that establishes a different rule for an account debtor who is an individual and who incurred the obligation primarily for personal, family, or household purposes).

counsel explained that because the jury had found that the transaction was not a consumer transaction, business and commerce code section 9.626(a)(3) applied, and he asked the trial court to deduct the $143,713.85 found by the jury as the collateral's value from the amount of the debt, expenses, and attorney's fees. Monroe's counsel countered by pointing out that the jury found that SunTrust neither provided notice nor made a commercially reasonable sale, resulting in no deficiency. The trial court entered a take-nothing judgment as to both parties.

SunTrust filed a motion to modify, correct, or reform the judgment, arguing that instead of a take-nothing judgment, the trial court should have awarded the amount due and owing under the contract—$92,541.52—because the damages were liquidated. Alternatively, SunTrust argued that it was entitled to $25,635.37, the unpaid principal amount less the jury's finding of the collateral's value in a commercially reasonable transaction—$169,349.22 minus $143,713.85—plus interest. SunTrust further argued that the trial court should have deducted SunTrust's expenses incurred in disposing of the collateral because they were undisputed and conclusively established by the evidence and, to the extent that the damages were not liquidated or were found to be contested, the trial court should have made and filed written findings on damages pursuant to rule of civil procedure 279. In its motion, SunTrust also sought a new trial.

In the portion of its motion requesting a new trial under rule of civil procedure 320, SunTrust requested a new trial on damages, on the value of the collateral in a commercially reasonable transaction, and on whether Monroe

16

received the required notice if the court found that it could not reform the judgment. SunTrust argued that there was no evidence to support the jury's finding that the value of the collateral in a commercially reasonable transaction would be $143,713.85 when there was no evidence submitted by either party that would support this amount. SunTrust also argued that there was no evidence to support the jury's finding that Monroe did not receive the required notice under sections 9.611 or 9.614.

Monroe responded that SunTrust was not entitled to a deficiency judgment because there had been no testimony at trial regarding the amount due and owing at the time of foreclosure, that it was not determined by any jury question, and that there was no stipulation about it. Monroe further argued that SunTrust had waived its right to any deficiency when it failed to submit a jury question under rules of civil procedure 278 and 279. And while the admissibility and authenticity of the demand notices were stipulated to, the parties did not stipulate as to the accuracy of the amounts allegedly due and owing.

The trial court denied SunTrust's motion after a hearing.

### III. Sufficiency

In its first two issues, SunTrust seeks a ruling that the trial court erred by entering a take-nothing judgment because its damages were proved as a matter of law. And in its third issue, SunTrust argues that the trial court erred by failing to reform the judgment or grant its motion for new trial. SunTrust argues:

17

- That its evidence established that the sale of the collateral was in conformity with industry standards and that Monroe was provided with legally sufficient notice;

- That Monroe offered no competent evidence that the sale of the vehicle was in bad faith or that any other irregularity occurred, and that the jury's findings that Monroe did not receive statutorily sufficient notice or that the sale was not commercially reasonable were therefore against the great weight of the evidence;

- That the evidence was both legally and factually insufficient to support the jury's finding of $143,713.85 when SunTrust proffered evidence of the ADESA check following the repair and sale of the collateral at auction and evidence that $92,514 was due after the sale of the collateral based on the sale, collection costs, and repairs;[18] and

- That the trial court should have ordered a new trial on damages or should have entered the amount of SunTrust's damages as a matter of law because the amount due and owing under the contract was liquidated.

Monroe responds that SunTrust failed to preserve its first and second issues regarding its challenges to the sufficiency of the evidence to support the

---

[18]SunTrust argues that it demonstrated that it spent $38,942.30 on repossession and repairs, while Monroe speculated that he could have sold the collateral for $165,000 or $180,000. But the ADESA check was admitted only for record purposes. Although the court reporter listed Plaintiff's Exhibit 15, "Voided Check," as admitted, the trial judge clearly stated, "*So just for the record purposes*, I'm admitting the check itself as Exhibit 15." [Emphasis added.] During Monroe's attorney's voir dire of Kelly about the check, Kelly acknowledged that it was a third party's check issued by ADESA, that SunTrust was not the payor on the payor line, and that she could not say who actually generated it. She acknowledged that she did not maintain ADESA's records, was not familiar with how ADESA maintained its books and records, and did not know if she had any affidavits in her file that would show that it was a true and correct copy of a document out of ADESA's file. SunTrust's attorney subsequently made an offer of proof as to Plaintiff's Exhibit 15, which the trial court had excluded when Monroe objected to lack of foundation based on lack of personal knowledge. SunTrust does not complain on appeal about the exclusion of its evidence.

18

jury's commercial reasonableness and collateral value findings and its complaint regarding its damages.

## A. Preservation of Error

The general rule to preserve a complaint for appellate review is that a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a); *see also* Tex. R. Evid. 103(a)(1). If a party fails to do this, error is not preserved, and the complaint is waived. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g). The objecting party must also get an express or implied ruling (or a refusal to rule) from the trial court. Tex. R. App. P. 33.1(a)(2), (b); *Lenz v. Lenz*, 79 S.W.3d 10, 13 (Tex. 2002).

Further, in a jury trial—as here—a party's no-evidence and matter-of-law issues must be preserved through one of the following procedural steps in the trial court: (1) a motion for instructed verdict; (2) a motion for judgment notwithstanding the verdict (JNOV); (3) an objection to the submission of the question to the jury; (4) a motion to disregard the jury's answer to a vital fact question; or (5) a motion for new trial. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220–21 (Tex. 1992); *see also* Tex. R. Civ. P. 324(b) (listing appellate complaints that must be preserved by a motion for new trial).

SunTrust did not move for an instructed verdict or for a JNOV, did not object to the submission of any of the questions to the jury, and did not file a

19

motion to disregard any of the jury's answers. However, SunTrust filed a "Motion to Modify, Correct, or Reform Judgment and Motion for New Trial in the Alternative," which we review to determine whether it has preserved its first and second issues.

In part of its motion, SunTrust argued—albeit in a roundabout way—that there was no evidence to support the jury's finding that the sale of the collateral was not commercially reasonable, stating, "In the present case, there is no evidence to support the jury's finding that the value of the collateral in a commercially reasonable transaction would be $143,713.85." Accordingly, we conclude that it has preserved its legal sufficiency challenges to the jury's commercial reasonableness and collateral value findings in its first issue, although not its factual sufficiency challenges to these findings.

In another part of the same motion, SunTrust argued that there was no evidence to support the jury's finding that Monroe did not receive the required notice, which supports the portion of its first issue in which it argues that Monroe was provided legally sufficient notice. Finally, in its motion, SunTrust argued that its damages and the amount due under the contract were proven as a matter of law, and it sets out the same arguments in its issue 2—mostly verbatim—with regard to whether the trial court erred by entering a take-nothing judgment as to its damages. Accordingly, we conclude that SunTrust's arguments in its second issue have been preserved for our review.

**B. Standard of Review**

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. *City of Keller*, 168 S.W.3d at 819. They may choose to believe one witness and disbelieve another. *Id.* Reviewing courts cannot impose their own opinions to the contrary. *Id.*

Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or

suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)), *cert. denied*, 541 U.S. 1030 (2004). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

If a party is attacking the legal sufficiency of an adverse finding on an issue on which the party had the burden of proof, and there is no evidence to support the finding, we review all the evidence to determine whether the contrary proposition is established as a matter of law. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989).

Absent an objection to the jury charge, the sufficiency of the evidence is reviewed in light of the charge submitted. *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 221 (Tex. 2005) (citing *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001)).

A trial court may disregard a jury finding only if there is no evidence to support the finding or if it is immaterial. *GuideOne Lloyds Ins. Co. v. First Baptist Church of Bedford*, 268 S.W.3d 822, 831 (Tex. App.—Fort Worth 2008, no pet.) (op. on reh'g).

SunTrust preserved its legal sufficiency challenges to the jury's findings on notice, commercial reasonableness, and the collateral's value.

## C. Applicable Law

SunTrust sued Monroe for breach of contract, and no one challenges the jury's findings that Monroe entered the contract with Aston Martin, that Aston Martin assigned the contract to SunTrust, or that Monroe breached the contract by failing to make payments under the contract. *See Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 666 (Tex. App.—Fort Worth 2010, no pet.) (setting out the elements of a breach-of-contract claim).

A secured party has the right to take possession of collateral after a default and sell it "in its present condition or following any commercially reasonable preparation or processing," *see* Tex. Bus. & Com. Code Ann. §§ 9.609–.610(a) (West 2011), and then sue for any deficiency that remains after the proceeds from the sale of the collateral are applied to the debt. *Regal Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 596–97 (Tex. 2010). A secured creditor that seeks to recover a deficiency must prove that it acted in a "commercially reasonable" manner in disposing of collateral. *Id.* at 597. Every aspect of a disposition of collateral—including the method, manner, time, place, and other terms—must be commercially reasonable. Tex. Bus. & Com. Code Ann. § 9.610(b) (providing that if commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, at any time and place, and on any terms).

23

## 1. Notice

The jury found that SunTrust did not provide notification to Monroe under business and commerce code sections 9.611 or 9.614 "as required by Statute as shown above," in reference to the portions of sections 9.611 and 9.614 set out in the charge. The jury was instructed as follows:

> Sec. 9.611. NOTIFICATION BEFORE DISPOSITION OF COLLATERAL
>
> (a) In this section, "notification date" means the earlier of the date on which:
>
>> (1) a secured party sends to the debtor and any secondary obligor an authenticated notification of disposition; or
>>
>> (2) the debtor and any secondary obligor waive the right to notification.
>
> (b) Except as otherwise provided in Subsection (d), a secured party that disposes of collateral under Section 9.610 shall send to the persons specified in Subsection (c) a reasonable authenticated notification of disposition.
>
> (c) To comply with Subsection (b), the secured party shall send an authenticated notification of disposition to:
>
>> (1) the debtor;
>>
>> (2) any secondary obligor[.]

*See id.* § 9.611(a), (b), (c)(1)–(2) (West 2011).[19]

---

[19]The jury instruction did not include the remainder of subsection (c), which pertains to other parties with an interest in the collateral who had notified the secured party of their interest; subsection (d), which applies to collateral that is perishable or "threatens to decline speedily in value or is of a type customarily sold on a recognized market"; or subsection (e), a safe harbor for notification

24

The jury was not instructed on section 9.612, "Timeliness of Notification Before Disposition of Collateral."[20] The jury likewise was not instructed on section 9.613, "Contents and Form of Notification Before Disposition of Collateral: General," which sets out the rules that apply to non-consumer transactions. *See id.* § 9.613 (West 2011). With regard to notification, the jury was instructed only on the portion of section 9.611 recited above, and on section 9.614, which was set out in the charge as follows:

> Sec. 9.614 CONTENTS AND FORM OF NOTIFICATION BEFORE DISPOSITION OF COLLATERAL: CONSUMER-GOODS TRANSACTION.
>
> In a consumer-goods transaction, the following rules apply:
>
> (1) A notification of disposition must provide the following information:
>
> (A) the information specified in Section 9.613(1);[21]

---

under subsection (c)(3)(B). *See* Tex. Bus. & Com. Code Ann. § 9.611(c)(3), (d), (e).

[20]Section 9.612 provides that in a non-consumer transaction, a notification is sent within a reasonable time before the disposition if it is sent after default and 10 days or more before the earliest time of disposition set forth in the notification; otherwise (i.e., in consumer transactions), whether a notification is sent within a reasonable time is a question of fact. *See* Tex. Bus. & Com. Code Ann. § 9.612 (West 2011).

[21]The charge did not contain the language in section 9.613(1), which states that except in a consumer goods transaction, the contents of a notification of disposition are sufficient if the notification describes the debtor and the secured party; describes the collateral that is the subject of the intended disposition; states the method of intended disposition; states that the debtor is entitled to an accounting of the unpaid indebtedness and the charge, if any, for an accounting; and states the time and place of a public disposition or the time after which any

25

(B) a description of any liability for a deficiency of the person to which the notification is sent;

(C) a telephone number from which the amount that must be paid to the secured party to redeem the collateral under Section 9.623[22] is available; and

(D) a telephone number or mailing address from which additional information concerning the disposition and the obligation secured is available.

(2) a particular phrasing of the notification is not required.

(3) The following form of notification, when completed, provides sufficient information:

_____ [Name and address of secured party]; _____ [Date] NOTICE OF OUR PLAN TO SELL PROPERTY; _____ [Name and address of any obligor who is also a debtor]; Subject: _____ [Identification of Transaction]; We have your _____[describe collateral], because you broke promises in our agreement. We will sell _____[describe collateral] *at public sale.* A sale could include a lease or license. *The sale will be held as follows:  Date:_____; Time:_____; Place:_____; You may attend the sale and bring bidders if you want.* [Emphasis added.]

*See id.* § 9.614(3) (West 2011).  The charge did not contain the safe harbor provision for sufficient notification of a private disposition of the property.  *Cf. id.* § 9.613(3).

---

other disposition is to be made.  Tex. Bus. & Com. Code Ann. § 9.613(1) (West 2011).

[22]The charge did not contain section 9.623, "Right to Redeem Collateral," which sets out how a person can redeem collateral and when the redemption is allowed to occur.  *See* Tex. Bus. & Com. Code Ann. § 9.623 (West 2011).

SunTrust contends that the trial court's charge "referenced the relevant sections of the Texas Business and Commerce Code," and that to show that Monroe received the requisite notice, it "entered evidence through the testimony of its witnesses and related exhibits that Monroe was notified of the repossession, pending disposal via private sale, date of the sale, and notice of deficiency and associated costs post-sale," and that Monroe presented no evidence to support the finding that he did not receive legally sufficient notice. SunTrust argues that because the jury determined that the transaction was commercial, the notice only had to comply with section 9.613.

Because no one objected to the charge, as stated above, we measure the sufficiency of the evidence not against a correct statement of the law but as the law is stated in the charge actually given. *See Romero*, 166 S.W.3d at 221. The record reflects that Monroe received a May 3, 2013 notice of SunTrust's plan to sell the collateral at a private sale. The May 3, 2013 notification was addressed to Monroe from SunTrust, described the collateral as 2012 Aston Martin V12 Vantage SCFEBBCF9CGS01050,[23] and stated that the method of intended disposition would be "**at a private sale sometime on or after May 19, 2013**." The notification also stated that if Monroe wanted a written explanation of how SunTrust calculated the amount he owed or wanted more information about the sale, he could call or write to SunTrust, and it provided a phone number and

---

[23]The jury charge defined the vehicle as "that 2012 Aston Martin V12 Vantage, VIN #SCFEBBCF9CGS01050."

address for him to do so. *See* Tex. Bus. & Com. Code Ann. § 9.613(1)(A)–(E) & cmt. 2. SunTrust's explanation of the calculation of the deficiency stated that the sale had occurred on October 24, 2013.

In contrast, the affidavit by Thore, SunTrust's repossession coordinator manager, stated that SunTrust had sent a notice to Monroe on May 3, 2015, that it consigned the collateral to ADESA on May 14, 2013, and that the collateral was not sold until October 24, 2015. Monroe testified that he thought he was given fair and adequate notice of SunTrust's repossession of the vehicle but not of what SunTrust intended to do with the vehicle as to the sale because he was never given a follow-up notice to let him know the time, date, place, or anything else about where it would take place.[24]

The jury found that the transaction was not a consumer transaction and therefore could have reasonably concluded that the charge's instructions on section 9.614 did not apply.[25] Section 9.611 requires a "reasonable" authenticated notification of disposition. *See id.* § 9.611(b). The jury could have determined that a notification followed by a delay of five months before a private sale at an auction was unreasonable when presented with no evidence about the

---

[24]No one asked Monroe whether he called or wrote to SunTrust—as set out in SunTrust's May 3 notice—to ask for more information about the sale.

[25]The jury also could have found that SunTrust's May 3, 2013 notification letter did not meet the 9.614(3) safe harbor set out in the charge because the notification letter stated that the collateral would be sold at a private sale, not a public sale, but this finding would not have mattered because of the jury's non-consumer-transaction finding. *See GuideOne*, 268 S.W.3d at 831.

vehicle's condition other than an allusion to repairs, about the sale itself, or about the auction process. *But see Fed. Deposit Ins. Corp. v. Lanier*, 926 F.2d 462, 466 (5th Cir. 1991) ("We believe that a Texas court would find that the sale of collateral four months after notification of the debtor was not so untimely as to mandate a finding that the creditor was required to renotify the debtor of the planned disposition."). Or the jury could have chosen to believe the facts stated in Thore's affidavit—that the vehicle was sold *two years* after SunTrust consigned the collateral to ADESA, again with no evidence about the vehicle's condition other than an allusion to repairs, about the sale itself, or about the auction process. Because there is not a complete absence of evidence to support the jury's finding, *see Ford Motor Co.*, 444 S.W.3d at 620, on the charge to which SunTrust did not object, we overrule this portion of SunTrust's first issue as to whether Monroe received legally sufficient notice of disposition.

### 2. "Commercially Reasonable"

#### a. Charge and Applicable Law

The jury charge sets out section 9.610, "Disposition of Collateral After Default," which states, in pertinent part, "After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing," and "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms must be commercially reasonable." Tex. Bus. & Com. Code Ann. § 9.610(a), (b). The jury charge also sets out section 9.627,

29

"Determination of Whether Conduct was Commercially Reasonable," which states,

> (a) The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner.
>
> (b) A disposition of collateral is made in a commercially reasonable manner if the disposition is made:
>
>> (1) in the usual manner on any recognized market;
>>
>> (2) at the price current in any recognized market at the time of the disposition; or
>>
>> (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.
>
> (c) A collection, enforcement, disposition, or acceptance is commercially reasonable if it has been approved:
>
>> (1) in a judicial proceeding;
>>
>> (2) by a bona fide creditors' committee;
>>
>> (3) by a representative of creditors; or
>>
>> (4) by an assignee for the benefit of creditors.
>
> (d) Approval under Subsection (c) need not be obtained, and lack of approval does not mean that the collection, enforcement, disposition, or acceptance is not commercially reasonable.[26]

---

[26]Although the charge does not include the comments to section 9.627, we note that subsection (b)(1) and (2)'s "recognized market" is limited and "applies only to markets in which there are standardized price quotations for property that is essentially fungible, such as stock exchanges," and the explanation that while a low price is not sufficient alone to establish a violation, "a low price suggests

*See id.* § 9.627 (West 2011).

"Commercial reasonableness" at its core is a fact-based inquiry that requires a balance of Article 9's two competing policies—protecting debtors against creditor dishonesty and minimizing interference in honest dispositions. *Regal Fin. Co.*, 355 S.W.3d at 602. Courts have considered a number of non-exclusive factors when addressing the term "commercial reasonableness," such as (1) whether the secured party endeavored to obtain the best price possible; (2) whether the collateral was sold in bulk or piecemeal; (3) whether it was sold via private or public sale; (4) whether it was available for inspection before sale; (5) whether it was sold at a propitious time; (6) whether the expenses incurred during the sale were reasonable and necessary; (7) whether the sale was advertised; (8) whether multiple bids were received; (9) what state the collateral was in; and (10) where the sale was conducted. *Id.* at 601–02. The inquiry's ultimate purpose is to ensure the creditor realizes a satisfactory price, which "is not necessarily the highest price, and it is recognized that secured creditors frequently sell in the low end of the wholesale markets." *Id.* at 602. None of these items or ideas were presented in the charge to the jury, which was left to fill

---

that a court should scrutinize carefully all aspects of a disposition to ensure that each aspect was commercially reasonable." Tex. Bus. & Com. Code Ann. § 9.627 cmts. 2, 4. The charge also does not explain that these statutory "safe harbors" are not the exclusive means of proving commercial reasonableness. *See Regal Fin. Co.*, 355 S.W.3d at 599.

31

in its own idea of "commercially reasonable," but we find instructive a comparison to the supreme court's opinion in *Regal Finance*.

In *Regal Finance*, the supreme court reviewed the intermediate court's reversal of a judgment on a jury's commercial reasonableness finding involving the sale of used vehicles as collateral*. Id.* at 597. In that case, several witnesses had testified about the secured creditor's dispositions of the repossessed vehicles, including the person hired by the secured creditor to evaluate and dispose of them. *Id.* at 602. That individual testified that with regard to the 906 dispositions, he inspected each vehicle, completed a condition report, and used that information to produce a separate report that included the vehicle's features and an estimated value and then attempted to solicit— sometimes unsuccessfully—at least two bids from wholesalers; most of the sales were made privately to a small number of trusted automobile wholesalers due to the generally poor condition and high mileage of the vehicles, which limited the price that could be obtained by selling to non-wholesalers. *Id.* at 602–03. The record also contained the 906 loan files showing evidence of the time, place, and other terms of each disposition, and while not all of the files were complete, a complete file would contain the loan note, a copy of the certificate of title, a loan payment record, a repossession affidavit, a vehicle condition report, a NADA form estimating value, and any bids tendered for the vehicle; copies of various negotiable instruments containing the date, time, and price and identifying the collateral's buyer were also entered into evidence. *Id.* at 602. The court

32

reversed the intermediate appellate court's judgment that there was no evidence of commercial reasonableness and remanded the case for a factual sufficiency review. *Id.* at 603.

On remand, the intermediate court considered the testimony of various witnesses, including one who testified about the various ways to resell cars and another who testified about having unsuccessfully bid on the secured creditor's repossessed vehicles. *Tex Star Motors, Inc. v. Regal Fin. Co.*, 401 S.W.3d 190, 198 (Tex. App.—Houston [14th Dist.] 2012, no pet.). In light of all of the evidence in the record from testimony and loan files, the court concluded that the evidence was not so weak as to render the jury's finding of commercial reasonableness unfair or unjust. *Id.* at 198–99.

### b. Analysis

The jury here was instructed that every aspect of the disposition—method, manner, time, place, and other terms—had to be commercially reasonable, *see* Tex. Bus. & Com. Code Ann. § 9.610(b), and we have already concluded that the jury had sufficient evidence upon which to determine—based upon the law as set forth in the unobjected-to charge by which it was bound—that SunTrust's notice was not reasonable.

Additionally, SunTrust presented little evidence to support its contention that the collateral's sale was made in a commercially reasonable manner. Monroe testified that he had not received anything from SunTrust to tell him the time, date, place, or anything else about the sale or to show SunTrust's other

33

attempts to sell the vehicle; that he had not seen any documents about the actual sale; that he had looked at Kelly Blue Book's retail value and NADA Black Book's wholesale value, as well as online research, to reach his own valuation of $165,000 to $175,000; and that he was astounded that the vehicle had been sold for $115,000. As to the $38,000 in repossession expenses, Monroe testified that in his experience as a bail bondsman, this was higher than any repossession fee he had ever seen, although he acknowledged never having collateralized an Aston Martin when issuing a bond.

Kelly, SunTrust's officer, testified that it was common in the banking industry to use dealers like ADESA, an auction house in Dallas, to sell repossessed used vehicles. Through her, the trial court admitted into evidence "a complete pay history for the subject loan," a one-sheet document entitled "ALS Purge Account System – Transaction Detail" from October 13, 2012 to October 17, 2013. Kelly did not explain what the "NO ACCT/CANNOT" entries meant or why the "REPO FEE" entries dated May 3, 2013 and May 10, 2013 were $176.19 and $750, respectively, but the "repossession expenses" in the November 2, 2013 explanation of the calculation of the deficiency were $38,942.30. Kelly stated that SunTrust had authorized repairs for the vehicle but did not elaborate on what those repairs were, why they were needed, or how much they had cost.

While Kelly's testimony may have provided some evidence of a commercially reasonable manner with regard to the "otherwise in conformity with

34

reasonable commercial practices among dealers in the type of property that was the subject of the disposition" standard, *see id.* § 9.627(b), the jury was not obliged to believe her testimony. Compounded with the lack of any evidence for the jury's fact-based inquiry to determine whether SunTrust endeavored to obtain the best price possible for the vehicle, the dichotomy between the jury instruction about a public sale and the notification for private sale, the time lapse between the notification and the sale, and the lack of evidence with regard to the state of the collateral and whether the expenses incurred in the sale were reasonable and necessary, we conclude that the jury could have reasonably determined that SunTrust did not dispose of the collateral in a commercially reasonable manner. *See Regal Fin. Co.*, 355 S.W.3d at 602 (explaining that "commercial reasonableness" is a fact-based inquiry). We overrule this portion of SunTrust's first issue.

### c. Value of Collateral

The jury found that the value of the collateral in a commercially reasonable transaction would be $143,713.85. SunTrust complains that the evidence is legally insufficient to support this finding.

The record reflects that the vehicle's original price in October 2012 was $233,305.46, and seven months later, in May 2013, the vehicle was repossessed. SunTrust sold the vehicle for $115,000, in what the jury determined was a commercially unreasonable sale. No evidence was admitted as to the vehicle's condition at or before the time of sale. Although Kelly testified

35

that SunTrust had authorized repairs on the vehicle, no testimony was elicited as to what kind of repairs were made or why they were necessary. Monroe testified, as the vehicle's co-owner, that he would have expected the car to sell for $165,000 to $175,000.

Generally, the factfinder has broad discretion to identify a value within the range of evidence presented at trial, so long as a rational basis exists for it, considering matters such as the original cost, the opinions of qualified witnesses, including the owner, the use to which the property was put, and any other reasonably relevant facts. *See Basic Energy Serv., Inc. v. D-S-B Props., Inc.*, 367 S.W.3d 254, 266 (Tex. App.—Tyler 2011, no pet.) (op. on reh'g) (describing damages calculations as being established with reasonable certainty but not mathematical precision); *see also Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002) (describing measure of damages for goods with no recognized market value). Here, the evidence provided the jury a range to consider—from $115,000 to $175,000. The jury's finding—$143,713.85—fits squarely within this range, and on this record we cannot conclude that the finding is not supported by legally sufficient evidence. Accordingly, we overrule the remainder of SunTrust's first issue.

### d. Deficiency

In its second issue, SunTrust complains that it proved its damages as a matter of law because it sought the balance on a promissory note, referring us to *Guerra v. M.H. Equities, Ltd.*, No. 02-11-00261-CV, 2012 WL 2135596 (Tex.

36

App.—Fort Worth June 14, 2012, no pet.) (mem. op.). *Guerra* involved the appeal of a summary judgment on an unliquidated damages claim in which M.H. Equities sued Guerra under a retail installment contract for foreclosure of its security interest in Guerra's manufactured home. *Id.* at *1. M.H. Equities's agent stated in an affidavit that Guerra owed $20,644.60—$14,499.55 in principal and $1,145.05 in interest and in escrow on the sales contract—and attached records of the amounts owed and how the total was calculated but not what amounts were included to bring the total to $20,644.60. *Id.* We noted that while typically the balance on a promissory note is a liquidated damage because the difference between the amount of indebtedness alleged to be due and the face amount of the note does not create ambiguity or raise a question of fact regarding payment credits, in *Guerra*, the summary judgment evidence raised a fact issue as to how much Guerra owed because it was unclear how the $20,644.60 was calculated and why the additional $5,000 was included in that total. *Id.* at *2.

In its first amended petition, SunTrust claimed that the principal balance due was $92,541.52 and requested $10,000 in attorney's fees.

The evidence at trial showed that the car was originally sold new for $233,305.46 (including a $41,978.42 down payment); $173,109.37 was the amount of the debt plus $18,217.67 as a finance charge, for a total amount of $191,327.04. Two payments were applied to the balance—one for $2,790.19, and another for $2,657.32. According to SunTrust's May 3, 2013 notice, the unpaid principal balance plus interest, late charges, repossession expenses, and

37

"Accumulated Fees and Costs" was $172,325.51. According to Thore's affidavit, the aggregate amount of the obligation as of October 24, 2013 was $173,703.77. SunTrust's November 2, 2013 explanation of the deficiency listed the same amount.

According to SunTrust's November 2, 2013 explanation of the deficiency, minus the sales proceeds of $115,000, Monroe had an outstanding balance on the debt of $58,703.77, but then SunTrust added $39,510.45 in repossession expenses, accumulated fees and costs, and late charges to reach a total deficiency of $98,214.22. Thore's affidavit stated that the amount due under the loan was $172,325.51 and that after the vehicle's sale and applicable fees, the net amount from the sale was $76,807.70, resulting in a deficiency of $98,214.22. In Thore's affidavit, she listed $38,180.30 in fees and other expenses involved in the sale of the vehicle, alternatively referencing these as "Plus Repossession Expenses" in the amount of $38,942.30. Kelly testified that Monroe's balance owing "[s]hould be 92,514, and then I can't remember what in change."

As in *Guerra*, we conclude that the evidence presented by SunTrust raised a fact question as to the amount actually due and owing on the note, precluding the award of damages as a matter of law.

Further, a secured creditor must prove that it disposed of the collateral in a commercially reasonable manner before it may recover any deficiency. *Regal Fin. Co.*, 355 S.W.3d at 599. As noted above, the jury found that SunTrust had

38

failed to dispose of the collateral in a commercially reasonable manner. The jury charge contained section 9.626, "Action in which Deficiency or Surplus is in Issue," which provides,

(a) In an action arising from a transaction, other than a consumer transaction, in which the amount of a deficiency or surplus is in issue, the following rules apply:

(1) A secured party need not prove compliance with the provisions of this subchapter relating to collection, enforcement, disposition, or acceptance unless the debtor or a secondary obligor places the secured party's compliance in issue.

(2) If the secured party's compliance is placed in issue, the secured party has the burden of establishing that the collection, enforcement, disposition, or acceptance was conducted in accordance with this subchapter.

(3) Except as otherwise provided in Section 9.628,[27] if a secured party fails to prove that the collection, enforcement, disposition, or acceptance was conducted in accordance with the provisions of this subchapter relating to collection, enforcement, disposition, or acceptance, *the liability of a debtor or a secondary obligor for a deficiency is limited to an amount by which the sum of the secured obligation, expenses, and attorney's fees exceeds the greater of*:

(A) *the proceeds of the collection, enforcement, disposition, or acceptance; or*

(B) *the amount of proceeds that would have been realized had the noncomplying secured party proceeded in accordance with the provisions of this subchapter relating to collection, enforcement, disposition, or acceptance.*

---

[27]Although the jury charge did not contain section 9.628, "Nonliability and Limitation on Liability of Secured Party; Liability of Secondary Obligor," this provision does not appear to be relevant to the proceedings.

(4) *For purposes of Subdivision (3)(B), the amount of proceeds that would have been realized is equal to the sum of the secured obligation, expenses, and attorney's fees unless the secured party proves that the amount is less than that sum.*

*See* Tex. Bus. & Com. Code Ann. § 9.626(a) (West 2011) (emphasis added).

Because the jury found that SunTrust did not dispose of the collateral in a commercially reasonable manner, Monroe's liability for a deficiency was limited as set out above. The calculation of these damages correlates to jury question 7—"What sum of money, if any, if paid now in cash, would fairly and reasonably compensate SunTrust Bank for its damages, if any, that resulted from Mark A[.] Monroe's breach of the contract?" The answer to question 7 was conditioned on a "yes" answer to question 6, "Did Suntrust Bank dispose of the collateral securing the underlying contract in a commercially reasonable manner?" No one objected to the conditioning of this question; accordingly, SunTrust waived its right to this jury finding. Because the jury answered, "no" to question 6, it skipped question 7, and the trial court entered a take-nothing judgment. We overrule SunTrust's second issue.

## IV. New Trial

In its last issue, Suntrust argues that the trial court abused its discretion by not reforming the judgment or granting its motion for new trial. But, as discussed above, SunTrust did not object to the conditional jury question and waived any of its claims to have missing jury questions propounded when it failed to object

40

before the charge was read to the jury.  *See* Tex. R. Civ. P. 272.  We overrule SunTrust's third issue.

## V. Conclusion

Having overruled SunTrust's three issues, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

BONNIE SUDDERTH
CHIEF JUSTICE

PANEL:  SUDDERTH, C.J.; KERR and PITTMAN, JJ.

DELIVERED:  February 1, 2018